1  M. CRIS ARMENTA, P.C.
   M. Cris Armenta (State Bar No. 177403)
2     cris@crisarmenta.com
   217 Clancy Avenue
3  Bozeman, MT 59718
   Telephone: (310) 488-2080
4
   Attorneys for Plaintiff Krista Joiner
5

6

7                      UNITED STATES DISTRICT COURT

8                     CENTRAL DISTRICT OF CALIFORNIA

9

10

11  KRISTA JOINER, an individual, and on       Case No.
    behalf of BKIP. LLC, a California limited
12  liability company, and HITMARKER LLC,      **COMPLAINT FOR:**
    a California limited liability company,
13                                             **(1)  Trademark Infringement,**
                  Plaintiff,                        **Lanham Act § 32(1);**
14                                             **(2)  False Designation of**
            vs.                                     **Origin, Lanham Act**
15                                                  **§43(a)(1)(A);**
    HERO BRANDS, INC, a Delaware               **(3)  Conversion;**
16  corporation,                               **(4)  Declaratory Relief;**
                                               **(5)  Rescission/Cancellation of**
17                Defendant.                         **Trademark Assignment**
                                                    **and Correction of the**
18                                                  **Register; and**
                                               **(6)  Restitution based on**
19                                                  **Rescission**
20
                                                 **JURY DEMANDED**
21

22

23

24

25

26

27

28

_____
                        COMPLAINT

## <u>NATURE OF THE ACTION</u>

1.      This is an action arising from the prohibited assignment of three trademarks registered with the United States Trademark Office, in violation of an Automatic Restraining Order issued by the Los Angeles Superior Court in a divorce action, which prohibited the transfer of Plaintiff KRISTA JOINER's community property interest in said trademarks without her consent or a Court order.  This action seeks to invalidate and cancel the void and fraudulent assignments of the trademarks BRASS KNUCKLES to HERO BRANDS, INC. ("HERO BRANDS") and related claims for trademark infringement, false designation or origin and conversion.

2.      KRISTA JOINER pleads for and requests that this Court issue an order to the United States Trademark Office to make an appropriate entry in the register to reflect that BKIP, LLC ("BKIP") is the owner of the marks, and for damages arising from the exploitation of three registered trademarks.

## <u>THE PARTIES</u>

3.      Plaintiff KRISTA JOINER is an individual who resides within this district, and through her community property interest, was and is at all relevant times a beneficial owner in the entities that held the marks: WINSLOW & SHOOMAKER, LLC ("WINSLOW & SHOOMAKER"), a California limited liability company, BKIP, LLC, a California limited liability company, and HITMARKER, LLC ("HITMARKER") , a Delaware limited liability company.

4.      Defendant HERO BRANDS is a Delaware corporation which has its principal place of business within this district.

5.      The events and circumstances which gave rise to the claims herein arose within this district and within the Central District of California, in the Western District.

## JURIDISCTION AND VENUE

6.    This Court has jurisdiction pursuant to 15 U.S.C. § 1051, *et* seq. (the "Lanham Act"), and under 28 USC § 1331, 28 USC § 1332, 28 USC § 1338.

7.    Venue is proper in this judicial district, 28 U.S.C. §1391(b) and (c).

## FACTUAL BACKGROUND

8.    *Inception of the Brand:*  In 2016, PLAINTIFF KRISTA JOINER arrived at the idea to create a cannabis brand, inspired by a neighbor.  She encouraged her then-husband, who was an avid marijuana user, rapper ALVIN JOINER, also known as "Xzibit" to start a cannabis brand.  They chose the brand name BRASS KNUCKLES.  Together, they were co-founders; they agreed to use XZIBIT as the "front person" in order to promote his personal, take advantage of his past notoriety, and parlay of his known history as a marijuana user and rapper. Nevertheless, the couple's interest in the brand, BRASS KNUCKLES was developed during their marriage, is and was a community property asset, as it was created, conceived, developed and made during the marriage. The Joiners brought in two other "partners," and the entities that ultimately owned the BRASS KNUCKLES brand were apportioned 1/3 to each, including 1/3 to the Joiners.

9.    *Winslow & Shoomaker dba BRASS KNUCKLES:*  On May 9, 2016, an entity named WINSLOW & SHOOMAKER was formed by filing Articles of Organization with the California Secretary of State.  (**Ex. A.**)[1]

10.    On May 9, 2016, WINSLOW & SHOOMAKER filed a fictitious business statement, doing business as BRASS KNUCKLES, signed by Michael John Healy (aka Mike Healy).  (**Ex. B**.)

11.    *Owners of Winslow & Shoomaker:* The three members of WINSLOW & SHOOMAKER were RED SUSHI LLC (owned by David Aguilar), AIDIW LLC

---

[1]    All Exhibits are designated as (Ex. ___), and are hereby incorporated by reference as is fully set forth herein.

1  (owned by Michael Healy), and HITMARKER LLC (owned by the Joiners.)  Each

2  of these holding entities owned 1/3 interest.

3      12.    _TM Registrations:_  On October 25, 2016, WINSLOW &

4  SHOOMAKER filed trademark registration for a trademark, which was placed on

5  the Principal Register on May 22, 2018, as Registration Number 5,476,357 ("'357

6  BRASS") and is depicted as follows (**Ex. D.**)[2]



14      13.    On October 25, 2016, WINSLOW & SHOOMAKER filed a trademark

15  registration for the mark BRASS KNUCKLES, which was placed on the Principal

16  Register on May 22, 2018, as Registration Number 5,476,356 ("'356 BRASS) and is

17  depicted as follows (**Ex. E.**)



24      14.    On October 25, 2016, WINSLOW & SHOOMAKER filed a trademark

25  registration for the mark BRASS KNUCKLES, which was placed on the Principal

26  Register on August 14, 2018, as Registration Number 5,541,624 ("'624 BRASS")

---

[2]      For each of the three marks, each Registration Certificate is attached.

and consists of text only. (**Ex. F**.)

15.    *BKIP LLC:* On January 10, 2018, an entity named BKIP, LLC was formed by filing Articles of Incorporation with the California Secretary of State. (**Ex. G**.)

16.    On January 29, 2018, BKIP submitted its Statement of Information to the California Secretary of State, reflecting that its three members were: RED SUSHI LLC (owned by DAVID AGUILAR, "RED SUSHI"), AIDIW, LLC (owned by MIKE HEALY, "AIDIW"), and HITMARKER (owned by ALVIN JOINER, with a community property interest of KRISTA JOINER). (**Ex. H.**)

17.    *Hitmarker LLC:* On January 23, 2018, an entity named HITMARKER was formed by filings with the Delaware Secretary of State.  (**Ex. I.**)

18.    On February 20, 2018, HITMARKER  was registered with the California Secretary of State as a foreign limited liability company, with the sole owner listed as ALVIN JOINER, and therefore, jointly with KRISTA JOINER as community property. (**Ex. I.**)

19.    *Ownership Interest of Plaintiff:*  As a result of her marriage and her own hard work in developing the BRASS KNUCKLES brand, KRISTA owned a community property interest in HITMARKER and therefore, an effective 1/6 interest in BKIP and in WINSLOW & SHOOMAKER, through HITMARKER's 1/3 ownership of BKIP.

20.    *International Registration:* On August 22, 2018, WINSLOW & SHOOMAKER also obtained a registration on the International Patent & Trademark Register for BRASS KNUCKLES. (**Ex. J.**)

21.    *Success of the Brand:*  KRISTA JOINER caused the brand to retain counsel for the purpose of registering the trademarks as a means to protect and promote the brand and was instrumental in ensuring that the operations of the brand began and continued smoothly, given that her then-husband had no business

experience other than as a rapper from the 1990's, and a part-time actor with a cancelled show ("Pimp My Ride"), who smoked marijuana constantly, and who had filed for bankruptcy twice in order to avoid foreclosure on his modest home. KRISTA JOINER on the other hand, was a successful beauty executive, with a skill set that included sales, market promotion, product development, packaging, retail, distribution, and corporate protocols. She employed her skill set by hiring counsel, organizing the structure of the company, engaging counsel, recruiting and managing employees including the sales staff, product development, creating content textually and visually, creating marketing content and plans, and generation of sales leads and target markets, as well as the software selection for the management of the sales and operations.

22.     Despite ALVIN JOINER serving as the front man for negotiations and as the public face of the BRASS KNUCKLES brand, KRISTA JOINER's contributions were foundational and instrumental in the day-to-day operations and the development of the brand. She hired personnel, engaged and interfaced with counsel, and handled product development, while ALVIN JOINER served as the outward face of the brand and managed the pickups of millions of dollars of cash for the sale of the products. Contrary to public news reports, the success of the brand and ALVIN JOINER's relaunch into positive news was a direct result of KRISTA JOINER's know-now in branding and production development, along with encouragement to her husband, who had previously filed for bankruptcy twice and had not released any new music in more than a decade.

23.     Once the brand launched in May of 2016, it was an immediate success, with sales of approximately $600,000 in the first 6 weeks alone. The launch and rollout was a complete success and marked the start of what was to come over the next few years – a brand so successful that the couple regularly purchased luxury vehicles (Ferrari, Bentley, Rolls Royce) for cash, and had access to more than $20

million in cash from product sales.

24.    By year-end of 2017, BRASS KNUCKLES has achieved sales and total income of $58,175,748, and documented its valuation at $65,829,227. (**Ex. K**.)

25.    By year-end of 2018, BRASS KNUCKLES achieved sales and total income of $38,909,178 and documented its valuation at $104,759,035.40. (**Ex. L.**)

26.    Through substantial efforts, market research, and the hard work of the Joiners, BRASS KNUCKLES had become one of the leading recognizable brands in cannabis in less than two years, which consumers began to associate as a superior brand of retail available cannabis, appealing to consumers on a mass level, and becoming a nationally recognized brand, indeed, a famous brand. https://www.forbes.com/sites/javierhasse/2020/05/13/xzibit/

27.    In a civil action against owners of BRASS KNUCKLES (*Separzadeh et al. v. Winslow & Shoomaker LLC, et a.*, Los Angeles Superior Court Case No. BC720066), would-by investors in the brand claimed that the owners had represented the brand to have had a post-financing valuation of $170 million. WINSLOW & SHOOMAKER  by investors, the defendants in that action filed a First Amended Cross-Complaint on September 9, 2019, in the Los Angeles Superior Court.  They disputed the complaint's allegations that the brand had a $170 million post-financing valuation, but admitted they had signed an MOU for sale of 14.5% of the brand for $5 million, equal to a total brand valuation for BRASS KNUCKLES of $34.5 million.  (**Ex. M.**) KRISTA JOINER was not involved in the representations made by ALVIN JOINER as to these valuations - internal Management Report of BRASS KNUCKLES shows recorded sales in the amount of $38,929,809.40 and a year-end 2018 valuation of $104,759.036.40, demonstrating the market reach of the brand and its name recognition across the then-thriving cannabis market.  (**Ex. L.**)

28.     The media, news and advertising for BRASS KNUCKLES saturated the market and elevated the brand to famous status.  Periodicals and on-line publications included *Forbes*, industry trades and many other online and social media outlets.

29.     By mid-2020, the Joiners put their combined efforts into one of the products of BRASS KNUCKLES, developing a second brand, NAPALM. Nevertheless, KRISTA JOINER continued to police the BRASS KNUCKLES brand they had developed, and engaged counsel, including the Managing Partner at Winston Wolfe in Los Angeles to identify who was involved with unauthorized merchandise, stop unauthorized sales, and to collect or sue for damages.  KRISTA JOINER directed their counsel to undertake these tasks as a means of protecting the valuable brand and preserving it for use.  ALVIN JOINER represented that the BRASS KNUCKLES brand earned no income from the brand since 2018 and that it was no longer operating – such would void any later assignment of the brand as an assignment-in-gross.

30.     Less than six months later, KRISTA JOINER learned that ALVIN JOINER had been carrying on a long-term adulterous affair during their marriage with another woman for *years*, even as KRISTA JOINER and ALVIN JOINER were recovering from the death of their first child, and were together raising their second-born.  By all appearances, and as KRISTA JOINER believed (or wanted to believe), the Joiners were in a united and long-term marriage and business partnership.  Efforts to reconcile failed after ALVIN JOINER continue to simultaneously sleep with both KRISTA JOINER and the marriage interloper, spied on KRISTA JOINER using a drone, and continued to harass and abuse their then 1-year old son.  Nevertheless, ALVIN JOINER encouraged and used KRISTA JOINER to continue to pitch for investment monies and woo investors for their jointly owned cannabis brands.

31.     KRISTA JOINER filed a Petition for Dissolution in the Los Angeles Superior Court on February 22, 2021.  ALVIN JOINER acknowledged receipt of the Petition, which included the Standard Family Law Restraining Orders, also known as the Automatic Temporary Restraining Order ("ATRO").  Among other things, the ATRO prohibits either spouse:

> **transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life**

32.     The judgment of marital dissolution has been entered, but the property distribution issues remain outstanding, and a 10-day trial is set for April and May of 2026. And while the state trial court can resolve any property division issue or the breaches of fiduciary duty to ALVIN JOINER, it does not have the power or jurisdiction to award the remedies requested herein with respect to the status of the brand and the damages owned by HERO BRANDS.

33.     On December 28, 2022, in direct violation of the ATRO, ALVIN JOINER signed a Trademark Assignment, assigning all three trademarks – '356 BRASS, '357 BRASS, and -624 BRASS – to HERO BRANDS, INC. ("2022 Assignment").  The 2022 Assignment purported to assign "all right, title, and interest in and to said marks, together with the goodwill of the business symbolized by the marks" as of December 28, 2022. (**Ex. N.**)

34.     ALVIN JOINER did not inform KRISTA JOINER of the 2022 Assignment, nor did he obtain her consent to assign, transfer or sell the trademarks to HERO BRANDS, INC.   The 2022 Assignment, therefore, was a prohibited transaction, and was a violation of the ATRO, and was an impermissible transfer of interests without the consent of the co-community owner, KRISTA JOINER.

35. The 2022 Assignment was made by BKIP LLC after BKIP and its principals acknowledged, and asserted that BRASS KNUCKLESS was no longer operating as a brand – any assignment of it would be an invalid in-gross assignment and have no legal effect.

36. HERO BRANDS and its attorney, Eric L. Tanezaki, of Stetina Brunda Garred & Brucker, filed the 2022 Assignment with the United States Patent & Trademark Office on January 3, 2023. **(Ex. N.)**

37. Seven months later, on July 13, 2023, ALVIN JOINER purported to enter into another transaction through an Asset Purchase Agreement between: SOLID STRIKE, as the Buyer, and as the Seller: BKIP, WINSLOW & SHOOMAKER, AIDIW, HITMARKER and ALVIN JOINER ("Brass Sellers"). (**Ex. O**)

38. Based on information and belief, SOLID STRIKE conducts no business directly, and was formed and used simply as a "strawman" to conceal that the BRASS KNUCKLES brand was being transferred to Mike Healy, ALVIN JOINER's close associate, and one of the 3 partner/owners of the brand already.

39. This Asset Purchase Agreement included the following terms:

    a. That the Brass Sellers were then engaged in the business and marketing of cannabis related projects, sold through licensed cannabis businesses;

    b. That the Sellers had full authority to enter into the agreement and that no other person held a beneficial interest in the assets of the BRASS KNUCKLES brand;

    c. That the Buyer purchased all the intellectual properties rights, including the three subject trademarks – BRASS '356, BRASS '357 and BRASS '624;

    d. the payment by the Buyer of $724,445.65, to be paid to ALVIN JOINER only; and

e.      the assumption of certain liabilities by the Buyer.

40.      The Asset Purchase Agreement purported to sell and transfer the trademarks to SOLID STRIKE, despite the fact that the trademarks had *already been assigned* to HERO BRANDS in December of 2022, and that assignment was already on file before the United States Patent & Trademark Office. Therefore the Asset Purchase Agreement's attempted assignment was void and fraudulent.

41.      The Asset Purchase Agreement also contained a provision that required the Sellers to obtain the consent of any person whose consent was required.  No attempt to obtain KRISTA JOINER's consent to the Asset Purchase Agreement has been undertaken, and no state court order has been entered approving the undisclosed Asset Purchase Agreement.  Section 1.08 states:

> **Section 1.08 Third Party Consents.**  To the extent that Seller's rights under any Acquired Asset may not be assigned to Buyer without the consent of another Person which has not been obtained, *this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful,* and Seller, at its expense, shall use its best efforts to obtain any required consent(s) as promptly as possible.  If any such consent shall not be obtained of any attempted assignment would be ineffective or would impair Buyer's rights under the Acquired Asset in question so that Buyer would not in effect acquire the benefit of all such rights, to the maximum extent permitted by Law and the Acquired Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extend permitted by Law and the Acquired Asset,

with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer."

42.    It was not until more than one year later, on November 6, 2024, that KRISTA JOINER that Alvin Joiner had purported to sell his and her interests in the BRASS KNUCKLES brand, all of its intellectual property – including the three subject marks – and its related assets  - and had attempted to do so without her required consent or the approval of the Los Angeles Superior Court. When confronted with this discovery, ALVIN JOINER lied under the penalty of perjury, claiming that the assets had just been sold "in 2024," when in reality, ALVIN JOINER assigned the trademarks at first in 2022 and then entered into the Asset Purchase Agreement on July 13, 2023.

43.    Another month passed and with pressure from KRISTA JOINER's counsel, ALVIN JOINER finally produced the Asset Purchase Agreement in December of 2024, which when KRISTA JOINER learned of the specifics of the transaction set forth above. It was then that KRISTA JOINER learned that BKIP had purported to assign and sell all the interests in WINSLOW & SHOOMAKER, BKIP, and attempted to assign the marks to HERO BRANDS.  To this day, KRISTA JOINER has not consented to the sale of the BRASS KNUCKLES brand, nor has she been asked by anyone for her consent to any sale or assignment of her community property interest, including her interest in the marks.

44.    The Asset Purchase Agreement was signed by Matt Gless as a "partner" of an entity named SOLID STRIKE.  Based on information and belief, Gless was criminally indicted in the Southern District of California, and pled guilty, and therefore, was convicted of felonies, conspiracy and fraud in connection with the purchase of and sale of securities.  The Amended Judgment was entered in 2009, which included a term of imprisonment of 5 years and an order to pay a restitution award of more than $2 million for the benefit of his victims.   Matthew

Gless is also subject to a Judgment in an enforcement action brought by the Securities and Exchange Commission, entered on July 13, 2010, in which Gless was: (1) permanently restrained from using interstate commerce to defraud, obtain money or property through untrue statements, or to engage in any practice that would operate as a fraud; (2) prohibited from acting as the officer or director of any issuer with Section 12 securities or required to file reports under Section 15(d); and (3) ordered to pay restitution and interest in the amount of $3,169,640.

45.     KRISTA JOINER objects, on her own behalf and on behalf of BKIP and HITMARKER, of the transfer of any part of her interests on the BRASS KNUCKLES brand to SOLID STRIKE on this additional basis: the signer, on information and belief, is a convicted felon. KRISTA JOINER would not have entered into nor approved such a transaction, among other reasons, because cannabis regulations in every state prohibit or closely regulate the persons in control of cannabis industries and require clearing criminal background checks.

46.     The Asset Purchase Agreement also included a Side Letter dated July 13, 2023, by which HITMARKER, along with the other sellers, and ALVIN JOINER, agreed to indemnify SOLID STRIKE, for certain obligations up to the amount of $500,000.  ALVIN JOINER signed the side letter on behalf of HITMARKER, without informing KRISTA JOINER, nor obtaining her consent, creating a new obligation to the community. (**Ex. P**.)

47.     ALVIN JOINER did not seek nor possess the legal authority consent of KRISTA JOINER to assign or cause BKIP or HITMARKER to assign the marks to any individual or entity, including to HERO BRANDS or to SOLID STRIKE.  Nor did he have the legal authority or consent of KRISTA JOINER to enter into the 2022 Assignment or the Asset Purchase Agreement.  ALVIN JOINER's actions in executing the 2022 Assignment and the Asset Purchase Agreement violated the ATRO.  As a result, the 2022 Assignment and the assignment flowing from the

Asset Purchase Agreement are voidable transactions and KRISTA JOINER, for herself and for BKIP and HITMARKER, elects to void them in their entirety.

48.    On September 19, 2023, *after* the date of the Asset Purchase Agreement, HERO BRANDS assigned the all three trademarks -- '356 BRASS, '357 BRASS, and -624 BRASS – back to SOLID STRIKE LLC. **(Ex. M.)**

49.    Then, a month later, on October 26, 2023, SOLID STRIKE LLC assigned all three trademarks – '356 BRASS, '357 BRASS, and -624 BRASS – to HERO BRANDS, INC. ("2022 Assignment")  -- to none other than HERO BRANDS, the same entity that had received the assignment in December of 2022 and recorded it in 2023.  **(Ex. K.)**  This transaction, all of it, was violative of the ATRO and of KRISTA JOINER's community property interests, and is therefore void.  KRISTA JOINER elects to void this assignment as well.

50.    At his deposition on February 7, 2025, in the marital dissolution action, ALVIN JOINER testified under oath that HERO BRANDS is owned by Mike Healy, "Hero Brands is Mike Healy's company."  Mike Healy was also a 1/3 owner of the brands through the ownership of his holding company, AIDIW, in BKIP and WINSLOW & SHOOMAKER.  Thus, Mike Healy and his company, HERO BRANDS INC., were insiders, and were therefore knowledgeable that: (1) KRISTA JOINER was a beneficial owner; (2) that the ATRO was in place and prohibited the sale or transfer of community property assets, including the marks; (3) that KRISTA JOINER's consent was required for any such sale or assignment; (4) that the 2022 Assignment was invalid for lack of consent of KRISTA JOINER; (5) that the assignment and transfer through the Asset Purchase Agreement was invalid both because of the lack of consent, and because the marks had already been purportedly assigned to HERO BRANDS; (6) that there were no operations of BRS KNUCKLES, contrary to the representations made in the Asset Purchase Agreement; and that (7) insufficient consideration was provided, and that no

consideration was provided to KRISTA JOINER, or any one or combination of the above makes HERO BRANDS not a bona fide purchaser for value.

51.    Mike Healy knew of the divorce and of the effect of an ATRO, as he himself was subjected to one when he divorced from his first wife. So did the lawyer who recorded the 2022 Assignment, Eric L. Tanezaki. Attorney Tanezaki, was subject to an ATRO during his own 2002 California divorce action. The Chief Executive Officer, Secretary, and Director of HERO BRANDS, Michael Cancelleri, was also subjected to an ATRO in connection with his 2004 divorce action. Finally, SOLID STRIKE's "partner," who signed the Asset Purchase Agreement on behalf of SOLID STRIKE was also subject to an ATRO in his 2022 California divorce action. All in all, each and every one of the men involved who worked to deprive KRISTA JOINER of her beneficial interests in BRASS KNUCKLES and to place the valuable marks out of her reach, have all been subject to a previous ATRO in their own divorce actions, and therefore knew or should have known of the ATRO that was in effect that prohibited such a transfer or assignment or any transfer of ALVIN JOINER's interests without KRISTA JOINER's consent. This was not a no bona fide purchase for value.

52.    Mike Healy was an insider, who signed the initial formation documents for WINSLOW & SHOOMAKER and was one of the partners in the brands. Therefore, the transactions to his new company, HERO BRANDS, were not arms-length transactions. HERO BRANDS cannot be considered a bona fide purchaser in any event.

53.    On February 18, 2025, counsel for KRISTA JOINER wrote to Blake Oswalt, the Financial Controller & Investment Analyst at Toba Capital, who is also the registered agent for RED BEARD OPERATION. RED BEARD OPERATION is the entity which provided the $724,445.65, on behalf of SOLID STRIKE, to ALVIN JOINER, through a lawyer's IOLTA account for JK Legal and Consulting.

The specific topic of the writing was the intent to claw back the BRASS KNUCKLES interests for the community and contact with the seller.  No response came.

54.    At the time that HERO BRANDS first adopted and used the BRASS KNUCKLES marks, it was on constructive notice under 15 U.S.C. § 1072 of the proprietary rights held by BKIP, HITMARKER, and KRISTA JOINER's community property interests in the U.S. registered marks.  Notwithstanding such notice and knowledge, HERO BRANDS has continued to, and threatens to continue to, infringe on BKIP's marks, including all three marks for BRASS KNUCKLES. In fact, HERO BRANDS has used and is using and exploiting the marks, representing to the public that HERO BRANDS is the legitimate owner of the marks, when it is not. In the most recent and imminent instance, HERO BRAND has just expanded its exploitation from New York and several other states, to Nevada.  As such, it is infringing on the marks legitimately owned by BKIP, and the rights of KRISTA JOINER and HITMARKER.  On April 2, 2025, BRASS KNUCKLES announced its "return to Nevada.



"We're not just back - we're back with purpose," said Founder Mike Healy. "Partnering with Caliente Partners Group empowers us to elevate our product portfolio and continue delivering the premium quality that has made Brass Knuckles a legacy brand."

55.     In connection with this "return" to the Las Vegas market, BRASS KNUCKLES was described as a "legacy brand," meaning it is using and trading on the goodwill developed by WINSLOW & SHOOMAKER and BKIP. The owner of HERO BRANDS, LLC, Mike Healy, stated, "We're not just back – we're back with a purpose." The brand, stated to be owned by Hero Brands, Inc. is now described in the media as "founded in 2016," "a legacy cannabis brand," and "established in California."

56.     On June 2, 2025, Healy made more comments to the press, which were published on Yahoo!finance, and state explicitly that the brand was established in 2016, is a "legacy brand" and that Healy was celebrating its "return to the Nevada market."

57.     HERO BRANDS is using the marks on its website, www.brassknucklesog.com and advertising the sale of the BRASS KNUCKLES products at more than 200 retailers across several states. The advertising and use of the marks extends to other social media platforms, including Instagram, https://www.instagram.com/therealbrassknucklesog_/?hl=en The dba for BRASS KNUCKLESS filed by WINSLOW & SHOOMAKER was never cancelled, adding to the confusion in the market place as to the true owner(s) of the brand. Confusion abounds with journalists reporting as recently as 2025 that "Xzibit has diversified his portfolio with ventures in cannabis (Brass Knuckles)." https://www.facebook.com/profile.php?id=61569322929265

58.     KRISTA JOINER brings this action on her own behalf and also on behalf of BKIP and HITMARKER, pursuant to Section 800 of the California Corporations Code. A demand to the members of record of BKIP would be futile because: (1) Mike Healy owns HERO BRANDS and would, in effect, be asked to reverse the transaction or sue his own company; and (2) ALVIN JOINER is completely unresponsive to KRISTA JOINER, has ceased communication with her,

has blocked her emails and texts, and in order to avoid KRISTA JOINER, to the point that has not even seen their teenage son for nearly a year, choosing instead to devote his attention to the object of his adulterous affair, his music career, and traveling the world on luxury vacations, private plane jet setting, and downing bottles of vodka during live music performance events; (3) despite best efforts, David Aguilar, of RED SUSHI, cannot be located; his accountant claims to have lost contact with him, and there is no present address of record for him.

59.    For the same reasons, demand to HITMARKER would be futile. Counsel for KRISTA JOINER has made several written, in person, and in mediation to resolve ALVIN JOINER's actions with respect to BRASS KNUCKLES, to no avail.  It has been ALVIN JOINER's stated mission to run KRISTA JOINER into the ground financially, strip her of all her community property and separate property assets, announcing that "no more Kardashian lifestyle," and to strip her of her rightful beneficial ownership and economic interest in the marks, as a means of exacting his sense of rough justice against KRISTA JOINER, and sadly, collaterally, against their son. The amount of fury or unresolved trauma it takes to abandon your own child and even physically attack and choke a 13-year old, in favor of financial leverage and to exact revenge on KRISTA JOINER, is indicative of ALVIN JOINER's refusal to conduct himself reasonably and a member of a civilized society.  Therefore, any demand on AVIN JOINER would be futile, and the only remedy available to return the BRASS KNUCKLES brand to the community is a judicial remedy that corrects the ownership status of the marks can resolve the issue.

60.    The issues of the property division and the penalties against ALVIN JOINER for his breaches of fiduciary duty and is abandonment of his child will be addressed in the marital dissolution action, but the issue of the proper ownership of the marks, as between HERO BRANDS, BKIP and HITMARKER, must be heard

in this Court, the court of competent jurisdiction and with the exclusive jurisdiction of the asserted claim and the power to provide the remedies set forth by federal law under 18 U.S.C. § 1119.

## FIRST CLAIM FOR RELIEF

### Trademark Infringement under Section 32(1) of the Lanham Act

61.    KRISTA JOINER, BKIP and HITMARKER restate the foregoing paragraphs as if fully set forth herein.

62.    HERO BRANDS's unauthorized use of the BRASS KNUCKLES marks in commerce are likely to cause confusion, or to cause mistake, or to deceive, and constitutions trademark infringement of BKIP's registered mark under the Lanham Act § 43, 15 U.S.C. § 1114, and of the interests of HITMARKER, BKIP, and KRISTA JOINER in the marks.

63.    HERO BRANDS's actions have caused, and will continue to cause, irreparable harm to KRISTA JOINER, BKIP, and HITMARKER unless enjoined.

64.    HERO BRANDS knew, or should have known, of the rights of BKIP, HITMARKER, and of KRISTA JOINER, and of the rights of KRISTA JOINER to be informed of any assignment or sale of the community property asset, and therefore the trademark infringement is knowing, willful, and deliberate, making this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

65.    HERO BRANDS has profited and will continue to profit from its unlawful past and proposed actions.  HERO BRANDS' actions are causing and will cause BKIP and KRISTA JOINER monetary damage in amounts presently unknown but to be proved at trial.

## SECOND CLAIM OF RELIEF

### Infringement and Use of False Designation of Origin Under
### Section 43(a)(1)(A) of the Lanham Act

66.    KRISTA JOINER, BKIP, and HITMARKER restate the foregoing

paragraphs as if fully set forth herein.

67.     BKIP owns common law rights in the BRASS KNUCKLES MARKS, and KRISTA JOINER and HITMARKER both own beneficial interests in the marks.

68.     HERO BRANDS' unauthorized use of the BRASS KNUCKLES marks in commerce in connection with cannabis constitutes a false designation of origin, unfair competition and infringes on the BRASS KNUCKLES marks in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

69.     HERO BRANDS' activities are likely to cause confusion, mistake or deception or consumers or potential consumers, as to the affiliation, connection, or association of HERO BRANDS with BRASS KNUCKLES and are likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of HERO BRANDS' cannabis products.

70.     HERO BRANDS' actions have caused, and will continue to cause, irreparable harm to Plaintiffs unless HERO BRANDS is it is enjoined.

71.     HERO BRANDS knew, or should have known of the rights of KRISTA JOINER, and that no assignment or transfer of the marks from BKIP LLC or of the interests of HITMARKER could be transferred without the consent of KRISTA JOINER, and therefore, the false designation of origin, unfair competition, and infringement are knowing, willful, and deliberate, making this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

72.     HERO BRANDS knew, or should have known, of the rights of BKIP, HITMARKER, and of KRISTA JOINER, and of the rights of KRISTA JOINER to be informed of any assignment or sale of the community property asset, and therefore the trademark infringement is knowing, willful, and deliberate, making this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

73.     HERO BRANDS has profited and will continue to profit from its

unlawful past and proposed actions.  HERO BRANDS' actions are causing and will cause KRISTA JOINER, BKIP and HITMARKER monetary damages in amounts presently unknown but to be proved at trial.

### THIRD CLAIM OF RELIEF

### Conversion

74.    KRISTA JOINER and BKIP restate the foregoing paragraphs as if fully set forth herein.

75.    HERO BRANDS intentionally and substantially interfered with KRISTA JOINER's beneficial ownership of the brand BRASS KNUCKLES, all of its assets and related entities, and its valuable marks.  The interference is ongoing and has been substantial, severely affecting the rights of KRISTA JOINER.

76.    KRISTA JOINER did not consent to this interference.

77.    KRISTA JOINER is entitled to all damages flowing from the interference, the legal rate of interest during the time of conversion.

78.    KRISTA JOINER is also entitled to punitive and exemplary damages because the conversion effected by HERO BRANDS and its agents was done with malice, oppression and through fraud.  HERO BRANDS had advance notice of the rights of KRISTA JOINER, and Mike Healy even had a fiduciary duty to be honest and forthright to the other members (and their spouses) of BKIP, and breached those in order to take control of the brand BRASS KNUCKLES. The conduct was malicious because it was carried on by HERO BRANDS and Mike Healy with the willful and conscious disregard of KRISTA JOINER's rights to be informed of and to consent (or not consent) in any transactions, and to share in the profits of the brand. The conduct was oppressive because HERO BRANDS, and Mike Healy, has subjected KRISTA JOINER to cruel and unjust hardship – leaving her living stripped of the community's most valuable asset, only further emboldening ALVIN JOINER to continue to run KRISTA JOINER (and their son) into the ground

economically.

## **FOURTH CLAIM OF RELIEF**

### **Declaratory Relief**

79.    KRISTA JOINER and BKIP restate the foregoing paragraphs as if fully set forth herein.

80.    In or about December 28, 2022, and then again on July 13, 2023, ALVIN JOINER caused BKIP to transfer, sell and assign the BRASS KNUCKLES marks to HERO BRANDS, and SOLID STRIKE, executing the 2022 Assignment and the Asset Purchase Sale Agreement, without the knowledge of consent of KRISTA JOINER and in violation of the ATRO.

81.    KRISTA JOINER had no knowledge of the sale of the marks until November 4, 2024, and then learned more when she received the actual Asset Purchase Agreement in December of 2024.

82.    The marks were transferred with the intent to injure KRISTA JOINER and to deprive BKIP, HITMARKER, and the Joiner community property estate of the BRASS KNUCKLES trademarks and related assets.

83.    The actions in filing the 2022 Assignment and the assignment that flowed from the Asset Purchase Agreement were entered into without legal authority, in violation of a court order, and were voidable.

84.    Therefore, KRISTA JOINER, on her own behalf and on behalf of BKIP and HITMARKER, seek the following declarations: (1) that the 2022 Assignment is void; (2) that the assignments recorded in favor of HERO BRANDS for the marks are void, and (3) that the Asset Purchase Agreement is void, and each is without any effect.

## **FIFTH CLAIM FOR RELIEF**

### **Recission/Cancellation of the Trademark Assignments**
### **and Correction of the Register**

85.    KRISTA JOINER, on her own behalf and on behalf of BKIP LLC and HITMARKER LLC, restates the foregoing paragraphs as if fully set forth herein.

86.    15 U.S.C. § 1119 provides:

> In any action involving a registered mark, the court may determine the right to registration, order the cancellation or registrations, in while or in part, restore cancelled registrations, and otherwise rectify the registration of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make the appropriate entry upon the records of the Patient and Trademark Office, and shall be controlled thereby.

87.    The purported assignments were without consent of a beneficial owner, KRISTA JOINER, and in violation of the ATRO.

88.    The purported assignment of the marks should be voided, rescinded or cancelled and an order should issue to the Director of the United States Patent & Trademark Office to make an appropriate entry in the register to reflect that BKIP is the owner of the marks.

## SIXTH CLAIM FOR RELIEF

### Restitution Based on Recission

89.    KRISTA JOINER, on her own behalf and on behalf of BKIP and HITMARKER, restates the foregoing paragraphs as if fully set forth herein.

90.    HERO BRANDS entered into the conveyances, assignments and agreements alleged above without the knowledge or consent, in violation of the ATRO.

91.    As a result of their violation, HERO BRANDS has been unjustly enriched in any amount unknown but to be proved at trial.

92.    The conveyances, assignments and agreements made should be

rescinded and HERO BRANDS should be ordered to pay restitution for the amount of the unjust enrichment.

## PRAYER FOR RELIEF

WHEREFOR, KRISTA JOINER, for herself and for BKIP and HITMARKER, pray for a judgment:

### On the First through Sixth Claims for Relief:

1. Preliminarily and permanently enjoining and restraining HERO BRANDS and its officers, agents, servants, employees, licensees, distributors, attorneys, corporate affiliates, successors and assigns, and all persons or entities acting concert or participation with them in any way from the advertising, promoting, marketing, offering to sell, or selling of goods using in any way BKIP's BRASS KNUCKLES marks and any other false designation of original or false description or representation or any other things calculated or likely to cause confusion or mistake in the mind of the trade or public to deceive the trade or public into believing that HERO BRAND's businesses, goods or services are in any way associated or affiliated or related to the BRASS KNUCKLES trademarks.

### On First, Second and Third Claims for Relief:

2. For all damages in an amount to be proved at trial;

3. Directing HERO BRANDS to account for any pay over its profits to BKIP;

### On the Third Claim for Relief:

4. For punitive and exemplary damages in an amount to be proved at trial

### On the Fourth Claim for Relief:

5. For a declaration that the 2022 Assignment and the Asset Purchase Agreement, and all conveyances, assignments, that flowed therefrom are void and invalid.

**On the Fifth Claim for Relief:**

6. For an order to the Director of the United States Patent & Trademark Office to make an appropriate entry in the register to reflect that BKIP is the owner of the marks.

**On the Sixth Claim for Relief:**

7. For an accounting and restitution of all amounts or property wrongfully obtained by HERO BRANDS;


Dated: January 15, 2026          M. CRIS ARMENTA, P.C.
                                            M. Cris Armenta



                                 By: _M. Cris Armenta_____
                                        M. Cris Armenta

                                        Attorneys for Plaintiff KRISTA
                                        JOINER, for herself and on behalf of
                                        BKIP LLC and HITMARKER LLC

COMPLAINT

# EXHIBIT A

| LLC-1 | Articles of Organization of a Limited Liability Company (LLC) |
|---|---|

**2016134 10445**

To form a limited liability company in California, you can fill out this form, and submit for filing along with:
- A **$70** filing fee.
- A separate, non-refundable **$15** service fee also must be included, if you **drop off** the completed form.

*Important!* LLCs in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

LLCs may not provide "professional services," as defined by California Corporations Code sections 13401(a) and 13401.3.

Note: *Before submitting the completed form, you should consult with a private attorney for advice about your specific business needs.*

**FILED**
Secretary of State
State of California

**MAY 0 9 2016**

This Space For Office Use Only

**For questions about this form, go to** *www.sos.ca.gov/business/be/filing-tips.htm.*

**LLC Name** (List the proposed LLC name exactly as it is to appear on the records of the California Secretary of State.)

① Winslow & Shoomaker, LLC

*Proposed LLC Name*   The name **must** include: LLC, L.L.C., Limited Liability Company, Limited Liability Co., Ltd. Liability Co. or Ltd. Liability Company; and **may not** include: bank, trust, trustee, incorporated, inc., corporation, or corp., insurer, or insurance company.  For general entity name requirements and restrictions, go to www.sos.ca.gov/business/be/name-availability.htm.

**Purpose**

② The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**LLC Addresses**

③ a. 9626 Lurline Ave.     Chatsworth     CA   91311

     *Initial Street Address of Designated Office in CA - Do not list a P.O. Box*    *City (no abbreviations)*    *State*   *Zip*

    b.

     *Initial Mailing Address of LLC, if different from 3a*    *City (no abbreviations)*    *State*   *Zip*

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your initial agent to accept service of process in case your LLC is sued. You may list any adult who lives in California. You may **not** list an LLC as the agent. **Do not** list an address if the agent is a California registered corporate agent as the address for service of process is already on file.)

④ a. Katchko Vitiello & Karikomi, PC

     *Agent's Name*

    b.                                         CA

     *Agent's Street Address (if agent is not a corporation) - Do not list a P.O. Box*    *City (no abbreviations)*    *State*   *Zip*

**Management** (Check only one.)

⑤ The LLC will be managed by:

☐ One Manager    ☑ More Than One Manager    ☐ All Limited Liability Company Member(s)

This form must be signed by each organizer. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are made part of these articles of organization.

▶ _____      Michael Healy
*Organizer - Sign here*              *Print your name here*

| | By Mail | Drop-Off |
|---|---|---|
| Make check/money order payable to: **Secretary of State** Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | Secretary of State Business Entities, P.O. Box 944228 Sacramento, CA 94244-2280 | Secretary of State 1500 11th Street., 3rd Floor Sacramento, CA 95814 |

Corporations Code §§ 17701.04, 17701.08, 17701.13, 17702.01. Revenue and Taxation Code § 17941.
LLC-1 (REV 01/2014)

2014 California Secretary of State
www.sos.ca.gov/business/be

# EXHIBIT B

| LLC-1 | Articles of Organization of a Limited Liability Company (LLC) |

**20 16 13 41 0 4 45**

To form a limited liability company in California, you can fill out this form, and submit for filing along with:

- A **$70** filing fee.
- A separate, non-refundable **$15** service fee also must be included, if you **drop off** the completed form.

**Important!** LLCs in California may have to pay a minimum **$800** yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

LLCs may not provide "professional services," as defined by California Corporations Code sections 13401(a) and 13401.3.

Note: *Before submitting the completed form, you should consult with a private attorney for advice about your specific business needs.*

**FILED**
Secretary of State
State of California

**MAY 09 2016**

This Space For Office Use Only

**For questions about this form, go to** *www.sos.ca.gov/business/be/filing-tips.htm.*

**LLC Name** (List the proposed LLC name exactly as it is to appear on the records of the California Secretary of State.)

① __Winslow & Shoomaker, LLC__

*Proposed LLC Name*

The name **must** include: LLC, L.L.C., Limited Liability Company, Limited Liability Co., Ltd. Liability Co. or Ltd. Liability Company; and **may not** include: bank, trust, trustee, incorporated, inc., corporation, or corp., insurer, or insurance company. For general entity name requirements and restrictions, go to www.sos.ca.gov/business/be/name-availability.htm.

**Purpose**

② The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**LLC Addresses**

③ a. __9626 Lurline Ave.__ __Chatsworth__ __CA__ __91311__

*Initial Street Address of Designated Office in CA - Do not list a P.O. Box* — *City (no abbreviations)* — *State* — *Zip*

b. _____

*Initial Mailing Address of LLC, if different from 3a* — *City (no abbreviations)* — *State* — *Zip*

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your initial agent to accept service of process in case your LLC is sued. You may list any adult who lives in California. You may **not** list an LLC as the agent. **Do not** list an address if the agent is a California registered corporate agent as the address for service of process is already on file.)

④ a. __Katchko Vitiello & Karikomi, PC__

*Agent's Name*

b. _____ __CA__

*Agent's Street Address (if agent is not a corporation) - Do not list a P.O. Box* — *City (no abbreviations)* — *State* — *Zip*

**Management** (Check only one.)

⑤ The LLC will be managed by:

[ ] One Manager  [✓] More Than One Manager  [ ] All Limited Liability Company Member(s)

This form must be signed by each organizer. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are made part of these articles of organization.

► _____ Michael Healy

*Organizer - Sign here* — *Print your name here*

| Make check/money order payable to: **Secretary of State** Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | **By Mail** Secretary of State Business Entities, P.O. Box 944228 Sacramento, CA 94244-2280 | **Drop-Off** Secretary of State 1500 11th Street., 3rd Floor Sacramento, CA 95814 |

Corporations Code §§ 17701.04, 17701.08, 17701.13, 17702.01, Revenue and Taxation Code § 17941    2014 California Secretary of State
LLC-1 (REV 01/2014)    www.sos.ca.gov/business/be

# EXHIBIT C

**201801110045**

**Secretary of State**
**Articles of Organization**
Limited Liability Company (LLC)

LLC-1

**FILED**
**Secretary of State**
**State of California**

**JAN 10 2018**

IMPORTANT — Read Instructions before completing this form.

Filing Fee — $70.00

Copy Fees — First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* LLCs may have to pay minimum $800 tax to the California Franchise Tax Board
each year. For more information, go to https://www.ftb.ca.gov.

This Space For Office Use Only

**1. Limited Liability Company Name** (See Instructions – Must contain an LLC ending such as LLC or L.L.C. "LLC" will be added, if not included.)

BKIP LLC

**2. Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10880 WILSHIRE BLVD. SUITE 1000 | LOS ANGELES | CA | 90025 |
| b. Initial Mailing Address of LLC, if different than Item 2a | City (no abbreviations) | State | Zip Code |
| | | | |

**3. Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL – Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| DEAN | | AVEDON | |
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
| 10880 WILSHIRE BLVD. SUITE 1000 | LOS ANGELES | CA | 90025 |

CORPORATION – Complete Item 3c. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b |
|---|
| |

**4. Management** (Select only one box)

The LLC will be managed by:

☐ One Manager   ☑ More than One Manager   ☐ All LLC Member(s)

**5. Purpose Statement** (Do not alter Purpose Statement)

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company
may be organized under the California Revised Uniform Limited Liability Company Act.

**6. The Information contained herein, including in any attachments, is true and correct.**

*Lisa Selan*

Organizer sign here

LISA SELAN

Print your name here

LLC-1 (REV 04/2017)

2017 California Secretary of State
www.sos.ca.gov/business/be

**Attachment to Statement of Information** (Limited Liability Company)

**LLC-12A Attachment**

18-A36666

**A. Limited Liability Company Name**

BKIP LLC

This Space For Office Use Only

**B. 12-Digit Secretary of State File Number**

201801110045

**C. State or Place of Organization** (only if formed outside of California)

CALIFORNIA

**D. List of Additional Manager(s) or Member(s) -** If the manager/member is an individual, enter the individual's name and address. If the manager/member is an entity, enter the entity's name and address. Note: The LLC cannot serve as its own manager or member.

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Entity Name AIDIW LLC | | | |
| Address 10880 WILSHIRE BLVD SUITE 1000 | City (no abbreviations) LOS ANGELES | State CA | Zip Code 90025 |
| First Name | Middle Name | Last Name | Suffix |
| Entity Name HITMARKER LLC | | | |
| Address 10880 WILSHIRE BLVD SUITE 1000 | City (no abbreviations) LOS ANGELES | State CA | Zip Code 90025 |
| First Name | Middle Name | Last Name | Suffix |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| First Name | Middle Name | Last Name | Suffix |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| First Name | Middle Name | Last Name | Suffix |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| First Name | Middle Name | Last Name | Suffix |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| First Name | Middle Name | Last Name | Suffix |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |

# EXHIBIT D

# United States of America

## United States Patent and Trademark Office



**Reg. No. 5,476,357**

**Registered May 22, 2018**

**Int. Cl.: 25**

**Trademark**

**Principal Register**

Winslow & Shoomaker, LLC (CALIFORNIA LIMITED LIABILITY COMPANY)
9626 Lurline Avenue
Chatsworth, CALIFORNIA 91311

CLASS 25: Clothing; T-shirts; hoodies; headwear

FIRST USE 1-6-2016; IN COMMERCE 7-6-2017

The mark consists of the wording "BRASS KNUCKLES" above a drawing consisting of a stylized depiction of brass knuckles comprising four adjacent circles over a black rectangular shape, within which is the wording "LOS ANGELES EST 1996", all surrounded by an ornate scrolling pattern.

No claim is made to the exclusive right to use the following apart from the mark as shown: "LOS ANGELES EST 1996"

SER. NO. 87-214,559, FILED 10-25-2016



Director of the United States
Patent and Trademark Office

# United States of America
## United States Patent and Trademark Office



**Reg. No. 5,476,356**

**Registered May 22, 2018**

**Int. Cl.: 25**

**Trademark**

**Principal Register**

Winslow & Shoomaker, LLC (CALIFORNIA LIMITED LIABILITY COMPANY)
9626 Lurline Avenue
Chatsworth, CALIFORNIA 91311

CLASS 25: Clothing; T-shirts; hoodies; headwear

FIRST USE 1-6-2016; IN COMMERCE 7-6-2017

The mark consists of a crown over the wording "BRASS KNUCKLES" above a drawing consisting of a stylized depiction of brass knuckles comprising four adjacent circles over a black rectangular shape, within which is the wording "LOS ANGELES EST 1996", all surrounded by an ornate scrolling pattern.

No claim is made to the exclusive right to use the following apart from the mark as shown: "LOS ANGELES EST 1996"

SER. NO. 87-214,556, FILED 10-25-2016



*Andrei Iancu*

Director of the United States
Patent and Trademark Office

# EXHIBIT F

# United States of America

## United States Patent and Trademark Office

# BRASS KNUCKLES

**Reg. No. 5,541,624**

**Registered Aug. 14, 2018**

**Int. Cl.: 9, 10, 21**

**Trademark**

**Principal Register**

Winslow & Shoomaker, LLC  (CALIFORNIA LIMITED LIABILITY COMPANY)
9626 Lurline Avenue
Chatsworth, CALIFORNIA 91311

CLASS 9: Batteries

FIRST USE 1-6-2016; IN COMMERCE 7-6-2017

CLASS 10: Vaporizers for medical purposes; atomizers sold empty for medical use; vapor cartridges sold empty for medical use

FIRST USE 1-6-2016; IN COMMERCE 7-6-2017

CLASS 21: Glass jars

FIRST USE 1-6-2016; IN COMMERCE 7-6-2017

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 87-172,974, FILED 09-15-2016



Director of the United States
Patent and Trademark Office

# EXHIBIT G

**201801110045**

| | |
|---|---|
| Secretary of State<br>**Articles of Organization**<br>Limited Liability Company (LLC) | **LLC-1** |

**FILED**
**Secretary of State**
**State of California**

**JAN 10 2018**

IMPORTANT — Read Instructions before completing this form.

Filing Fee — $70.00

Copy Fees — First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* LLCs may have to pay minimum $800 tax to the California Franchise Tax Board
each year. For more information, go to *https://www.ftb.ca.gov*.

This Space For Office Use Only

**1. Limited Liability Company Name** (See Instructions – Must contain an LLC ending such as LLC or L.L.C. "LLC" will be added, if not included.)

BKIP LLC

**2. Business Addresses**

| a. Initial Street Address of Designated Office in California - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10880 WILSHIRE BLVD. SUITE 1000 | LOS ANGELES | CA | 90025 |
| b. Initial Mailing Address of LLC, if different than Item 2a | City (no abbreviations) | State | Zip Code |
| | | | |

**3. Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL – Complete Items 3a and 3b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| DEAN | | AVEDON | |
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
| 10880 WILSHIRE BLVD. SUITE 1000 | LOS ANGELES | CA | 90025 |

CORPORATION – Complete Item 3c. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b |
|---|
| |

**4. Management** (Select **only** one box)

The LLC will be managed by:

☐ One Manager    ☑ More than One Manager    ☐ All LLC Member(s)

**5. Purpose Statement** (Do not alter Purpose Statement)

The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company
may be organized under the California Revised Uniform Limited Liability Company Act.

**6. The Information contained herein, including in any attachments, is true and correct.**

Organizer sign here

LISA SELAN
Print your name here

LLC-1 (REV 04/2017)

# EXHIBIT H



**Secretary of State**
**Statement of Information**
(Limited Liability Company)

LLC-12

18-A36666

# FILED

In the office of the Secretary of State
of the State of California

JAN 29, 2018

**This Space For Office Use Only**

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees –** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC.  If you registered in California using an alternate name, see instructions.)

BKIP LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201801110045 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>10880 WILSHIRE BLVD SUITE 1000 | LOS ANGELES | CA | 90025 |
| b. Mailing Address of LLC, if different than item 4a<br>10880 WILSHIRE BLVD SUITE 1000 | LOS ANGELES | CA | 90025 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box<br>10880 WILSHIRE BLVD SUITE 1000 | LOS ANGELES | CA | 90025 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name and address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank).  If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank).  Note:  The LLC cannot serve as its own manager or member.  If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Entity Name - Do not complete Item 5a |
|---|
| RED SUSHI LLC |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10880 WILSHIRE BLVD SUITE 1000 | LOS ANGELES | CA | 90025 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| DEAN | | AVEDON | |

| b. Street Address (if agent is not a corporation) – Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10880 WILSHIRE BLVD SUITE 1000 | LOS ANGELES | CA | 90025 |

**CORPORATION** – Complete Item 6c only.  Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| MANAGEMENT COMPANY |

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 01/29/2018 | DEAN AVEDON | AGENT FOR SERVICE OF PROCESS | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed.  SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

# EXHIBIT I



**Secretary of State**
**Application to Register a Foreign Limited Liability Company (LLC)**

| LLC-5 |
|---|

**20180641 0405**

**IMPORTANT — Read Instructions before completing this form.**

Must be submitted with a current Certificate of Good Standing issued by the government agency where the LLC was formed. See Instructions.

**Filing Fee   –   $70.00**

**Copy Fees   –**   First page $1.00; each attachment page $0.50; Certification Fee - $5.00

*Note: Registered LLCs in California may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to https://www.ftb.ca.gov.*

**FILED**
**Secretary of State**
**State of California**

**FEB 20 2018**

**This Space For Office Use Only**

**1a. LLC Name** (Enter the exact name of the LLC as listed on your attached Certificate of Good Standing.)

HITMARKER LLC

**1b. California Alternate Name, If Required** (See Instructions – Only enter an alternate name if the LLC name in 1a is not available in California.)

**2.   LLC History** (See Instructions – Ensure that the formation date and jurisdiction match the attached Certificate of Good Standing.)

| a. Date LLC was formed in home jurisdiction (MM/DD/YYYY) | b. Jurisdiction (State, foreign country or place where this LLC is formed.) |
|---|---|
| 1 / 23 / 2018 | DELAWARE |

**c. Authority Statement** (Do not alter Authority Statement)

This LLC currently has powers and privileges to conduct business in the state, foreign country or place entered in Item 2b.

**3.   Business Addresses** (Enter the complete business addresses. Items 3a and 3b cannot be a P.O. Box or "in care of" an individual or entity.)

| a. Street Address of Principal Executive Office - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10880 WILSHIRE BLVD., SUITE 1000 | LOS ANGELES | CA | 90024 |

| b. Street Address of Principal Office in California, if any - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10880 WILSHIRE BLVD., SUITE 1000 | LOS ANGELES | CA | 90024 |

| c. Mailing Address of Principal Executive Office, if different than Item 3a | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**4.   Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 4a and 4b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| DEAN | | AVEDON | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10880 WILSHIRE BLVD., SUITE 1000 | LOS ANGELES | CA | 90024 |

**CORPORATION** – Complete Item 4c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) - Do not complete Item 4a or 4b |
|---|
| |

**5.   Read and Sign Below** (See Instructions. Title not required.)

I am authorized to sign on behalf of the foreign LLC.

| Signature | LISA SELAN, ESQ |
|---|---|
| | Type or Print Name |

LLC-5 (REV 01/2017)

2017 California Secretary of State
www.sos.ca.gov/business/be



Page 1

# The First State

     I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "HITMARKER LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTIETH DAY OF FEBRUARY, A.D. 2018.

     AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN ASSESSED TO DATE.

Jeffrey W. Bullock, Secretary of State

6723971  8300

SR# 20181129373

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202176182

Date: 02-20-18

**2 0 1 8 0 6 4 1 0 4 0 5**

# EXHIBIT J

WIPO
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

BRASS KNUCKLES

## REGISTERED TRADEMARK - USPTO (USA)

| | | | |
|---|---|---|---|
| 210 | Serial number | 220 | Application date |
| 87172974 | | September 15, 2016 | |
| 111 | Registration number | 151 | Registration date |
| 5541624 | | August 14, 2018 | |
| 551 | Kind of mark | | |
| Individual | | | |
| 550 | Type of mark | | |
| Word | | | |
| 511 | Nice classification - NCL | | |
| 9, 21, 10 | | | |
| 540 | Reproduction of the mark | | |
| BRASS KNUCKLES | | | |

## NAMES AND ADDRESSES

**730 NAME AND ADDRESS OF THE APPLICANT OR THE HOLDER**

- Name
Winslow & Shoomaker, LLC
- Kind
Legal Entity
- Address
```
9626 Lurline Avenue;
91311 Chatsworth; CA
```
- Country
USA

- Name
Winslow & Shoomaker, LLC
- Kind
Legal Entity
- Address
```
9626 Lurline Avenue;
91311 Chatsworth; CA
```
- Country
USA

**740 NAME AND ADDRESS OF THE REPRESENTATIVE**

- Name
Eric L. Tanezaki
- Kind
Attorney

**750 ADDRESS FOR CORRESPONDENCE**

- Name
Eric L. Tanezaki Stetina Brunda Garred & Brucker
- Address
```
75 Enterprise; Suite
250; Aliso Viejo
CA 92656; United States
```

## CLASSIFICATION

511 THE INTERNATIONAL CLASSIFICATION OF GOODS AND SERVICES FOR THE PURPOSES OF THE REGISTRATION OF MARKS (NICE

CLASSIFICATION)

9
batteries
21
glass jars
10
vaporizers for medical purposes • atomizers sold empty for medical use • vapor cartridges sold empty for medical use

## IP OFFICE - USPTO (USA)



Official status
Live/Registered
Status date
October 18, 2024
Country of filing
USA

Disclaimer: Global Brand Database does not ensure the correctness nor the completeness of the information.

## FURTHER INFORMATION

270     Application language
en

# EXHIBIT K

# Management Report

Brass Knuckles
For the period ended December 31, 2017



Prepared on
January 10, 2019

# Table of Contents

Profit and Loss ........................................................................................................................................3

Balance Sheet .........................................................................................................................................4

# Profit and Loss

January - December 2017

|  | Total |
|---|---|
| **INCOME** | |
| Sales | 36,429,517.96 |
| Sales of Product Income | 8,433,838.72 |
| Services | 13,311,402.32 |
| Unapplied Cash Payment Income | 989.00 |
| **Total Income** | **58,175,748.00** |
| **GROSS PROFIT** | **58,175,748.00** |
| **EXPENSES** | |
| Promotional | 71,740.00 |
| Uncategorized Expense | 6,800.00 |
| **Total Expenses** | **78,540.00** |
| **NET OPERATING INCOME** | **58,097,208.00** |
| **NET INCOME** | **$58,097,208.00** |

# Balance Sheet

As of December 31, 2017

|  | Total |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Other Current Assets** | |
| Undeposited Funds | 65,829,227.00 |
| **Total Other Current Assets** | **65,829,227.00** |
| **Total Current Assets** | **65,829,227.00** |
| **TOTAL ASSETS** | **$65,829,227.00** |
| **LIABILITIES AND EQUITY** | |
| **Liabilities** | |
| **Total Liabilities** | |
| **Equity** | |
| Retained Earnings | 7,732,019.00 |
| Net Income | 58,097,208.00 |
| **Total Equity** | **65,829,227.00** |
| **TOTAL LIABILITIES AND EQUITY** | **$65,829,227.00** |

# EXHIBIT L

# Management Report

Brass Knuckles

For the period ended December 31, 2018



Prepared on

January 10, 2019

# Table of Contents

Profit and Loss ........................................................................................................................................3

Balance Sheet ........................................................................................................................................4

# Profit and Loss

January - December 2018

|  | Total |
|---|---|
| **INCOME** | |
|     Sales | 19,537,864.57 |
|     Sales of Product Income | 11,005,708.38 |
|     Services | 8,365,605.05 |
|     **Total Income** | **38,909,178.00** |
| **GROSS PROFIT** | **38,909,178.00** |
| **EXPENSES** | |
|     Promotional | 41,219.00 |
|     Taxes & Licenses | -61,970.40 |
|     Uncategorized Expense | 120.00 |
|     **Total Expenses** | **-20,631.40** |
| **NET OPERATING INCOME** | **38,929,809.40** |
| **NET INCOME** | **$38,929,809.40** |

# Balance Sheet

As of December 31, 2018

|  | Total |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Other Current Assets | |
| Undeposited Funds | 104,759,036.40 |
| **Total Other Current Assets** | **104,759,036.40** |
| **Total Current Assets** | **104,759,036.40** |
| **TOTAL ASSETS** | **$104,759,036.40** |
| **LIABILITIES AND EQUITY** | |
| Liabilities | |
| **Total Liabilities** | |
| Equity | |
| Retained Earnings | 65,829,227.00 |
| Net Income | 38,929,809.40 |
| **Total Equity** | **104,759,036.40** |
| **TOTAL LIABILITIES AND EQUITY** | **$104,759,036.40** |

# EXHIBIT M

Electronically FILED by Superior Court of California, County of Los Angeles on 06/05/2019 03:17 PM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Delgadillo,Deputy Clerk

Case 8:26-cv-00117    Document 1    Filed 01/15/26    Page 59 of 105    Page ID #:59

Darren M. Richie (SBN 316116)
*darren@richielitigation.com*
Antonio Castillo (SBN 276891)
*delaney@richielitigation.com*
**RICHIE LITIGATION, P.C.**
633 W. 5th Street, Suite 6780
Los Angeles, CA 90071
Tel: (213) 265-7888
Fax: (844) 314-1380

Attorneys for Defendants and Cross-Complainants *Joiner, Rezaie, Winslow & Shoomaker, LLC, and BKIP, LLC*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

| | |
|---|---|
| DAVID SEPARZADEH, an individual; HELIOS DAYSPRING, an individual; and EMANUEL SEPARZADEH, an individual; | Case No: BC720066 Assigned to Hon. Patricia D. Nieto Dept. 24 |
| Plaintiffs, | |
| vs. | **CROSS COMPLAINT BY DEFENDANTS MICHAEL HEALY, ALVIN JOINER AND RYAN REZAIE AGAINST PARAMOUNT INVESTMENT GROUP, INC. AND PLAINTIFFS DAIVD SEPARZADEH AND EMANUEL SEPARZADEH FOR:** |
| WINSLOW & SHOOMAKER, LLC, a California limited liability company, doing business as BRASS KNUCKLES; BKIP, LLC, a California limited liability company; ALVIN JOINER, an individual; DAVID AGUILAR, an individual; MICHAEL HEALY, an individual; RYAN REZAIE, an individual; ANDRE R. YOUNG, an individual; ARY, INC., a California corporation; and DOES 1 through 100 inclusive, | **1. RESCISSION FOR FRAUD IN INDUCEMENT – CIVIL CODE § 1689(b)(1);** **2. RESCISSION FOR MISTAKE – CIVIL CODE § 1689(b)(1)** **3. NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS; and** **4. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS** |
| Defendants. | |
| | Complaint Filed: August 30, 2018 Trial Date: May 12, 2020 |
| ALVIN JOINER, an individual; MICHAEL HEALY, an individual; and RYAN REZAIE, an individual; WINSLOW & SHOOMAKER, LLC, a California limited liability company, doing business as BRASS KNUCKLES; BKIP LLC, a California limited liability | |

1

CROSS COMPLAINT BY DEFENDANTS MICHAEL HEALY, ALVIN JOINER, RYAN REZAIE, WINSLOW & SHOOMAKER, LLC AND BKIP LLC AGAINST PLAINTIFFS DAIVD SEPARZADEH, EMANUEL SEPARZADEH AND PARAMOUNT INVESTMENT GROUP

company,

Cross-Complainants,

vs.

DAVID SEPARZADEH, an individual; and EMANUEL SEPARZADEH, an individual; PARAMOUNT INVESTMENT GROUP, INC., a California corporation,

Cross-Defendants.

COMES NOW Cross-Complainants, Alvin Joiner, Michael Healy, Ryan Rezaie, Winslow & Shoomaker, LLC, and BKIP LLC (collectively "Cross-Complainants"), and allege as follows:

## PARTIES

1.      At all times mentioned herein, Cross-Complainant Alvin Joiner ("Joiner") was and is a resident of Los Angeles County, California.

2.      At all times mentioned herein, Cross-Complainant Michael Healy ("Healy") was and is a resident of Los Angeles County, California.

3.      At all times mentioned herein, Cross-Complaint Ryan Rezaie ("Rezaie") was and is a resident of Orange County, California.

4.      At all times mentioned herein, Cross-Complainant Winslow & Shoomaker, LLC ("W&S"), is and was a California limited liability company duly licensed to transact business in the State of California and with its principal place of business located in Los Angeles, California.

5.      At all times mentioned herein, Cross-Complainant BKIP, LLC ("BKIP"), is and was a California limited liability company duly licensed to transact business in the State of California and with its principal place of business located in Los Angeles, California.

6.      At all times mentioned herein, Cross-Defendant David Separzadeh is and was a resident of Los Angeles County, California.

7.      At all times mentioned herein, Cross-Defendant Emanuel Separzadeh is and was a resident of Los Angeles County, California.

8.      At all times mentioned herein, Cross-Defendant Paramount Investment Group, Inc.

CROSS COMPLAINT BY DEFENDANTS MICHAEL HEALY, ALVIN JOINER, RYAN REZAIE, WINSLOW & SHOOMAKER, LLC AND BKIP LLC AGAINST PLAINTIFFS DAIVD SEPARZADEH, EMANUEL SEPARZADEH AND PARAMOUNT INVESTMENT GROUP

("PIG") is and was a California corporation duly licensed to transact business in the State of California and with its principal place of business in Encino, California. At all times material hereto, PIG is and was the alter ego of Plaintiff/Cross-Defendant David Separzadeh, who is CEO of PIG, and there is and was a unity of interest between PIG and Plaintiff/Cross-Defendant David Separzadeh such that failure to recognize the alter ego relationship between these parties would lead to inequitable results in this litigation.

9. At all times mentioned herein, each of the Cross-Defendants was the agent and/or employee of each of the remaining Cross-Defendants and was at all times acting within the course and scope of said agency and employment.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the entire action by virtue of the fact that this is a civil action where the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of the Court. Further, the acts and omissions complained of in this action took place, in whole or in part, in the County of Los Angeles, California.

11. Venue is proper in this Court because the acts complained of took place within the venue of this Court.

## STATEMENT OF FACTS

12. Beginning in November and/or December of 2017, Cross-Defendants sought out contact with Cross-Complainants Healy and Joiner for the purposes of obtaining an interest in their business by misrepresenting the services that they could offer to Cross-Complainants Healy and Joiner in relation to the operation of W&S and/or BKIP. Specifically, during multiple conversations between Cross-Complainants Healy and/or Joiner and Cross-Defendants during this time, Cross-Defendants falsely represented the following:

(a) They owned multiple temporary licenses for the cultivation of cannabis in the Grover Beach and Santa Barbara County areas that they promised to extend and/or obtain permanent licenses for the same;

(b) They had influence with local and state politicians who could assist W&S's business interests;

CROSS COMPLAINT BY DEFENDANTS MICHAEL HEALY, ALVIN JOINER, RYAN REZAIE, WINSLOW & SHOOMAKER, LLC AND BKIP LLC AGAINST PLAINTIFFS DAIVD SEPARZADEH, EMANUEL SEPARZADEH AND PARAMOUNT INVESTMENT GROUP

(c)    They owned and/or controlled property in Grover Beach, California, that could be developed into a "Brass Knuckles Campus," that would serve as a large, commercial property and business operations headquarters for Winslow & Shoomaker;

(d)    They had extensive experience in the cannabis industry, including cultivation, distribution, licensing, regulation and marketing; and

(e)    David Separzadeh represented that he was a very experienced businessman who was on par with CEOs of large corporations.

13.    All of the representations in the preceding paragraphs were false and Cross-Defendants were aware that the representations were false at the time that they made them.

14.    Cross-Defendants made the false representations referenced above with the intention of inducing Cross-Plaintiffs Healy and Joiner to rely upon that information and offer them an opportunity to purchase an interest in W&S and/or BKIP.

15.    As Cross-Defendants sought out to involve themselves more and more in the affairs of W&S and/or BKIP, Cross-Defendants wanted W&S and/or BKIP to allocate more of its business to unregulated and unlicensed cannabis markets that would have put W&S and/or BKIP at risk of legal liability and/or would have damaged its image, brand and the overall value of those entities and their assets.

16.    The parties held discussions in March through May 2017 about the possibility of Cross-Defendants acquiring an interest in W&S and/or BKIP in exchange for payment of $5,000,000.

17.    The above-referenced discussions about the possibility of Cross-Defendants acquiring an interest in W&S and BKIP in exchange for payment of $5,000,000 resulted in Mike Healy, on behalf of W&S, and David Separzadeh, on behalf of PIG, executing a non-binding expression of interest on March 16, 2018, a copy of which was attached as Exhibit A to Plaintiff's Complaint.

18.    At some point in or around April of 2017, Plaintiff/Cross-Defendant David Separzadeh introduced Cross-Complainants Healy and Joiner to members of Toba Capital for the purposes of having Toba Capital assist Cross-Complainants Healy and Joiner with transitioning W&S and/or BKIP into a publicly traded corporation.    Plaintiff/Cross-Defendant David Separzadeh concealed from Cross-Complainants Healy and Joiner that he had a prior business relationship with Toba Capital that involved

4

CROSS COMPLAINT BY DEFENDANTS MICHAEL HEALY, ALVIN JOINER, RYAN REZAIE, WINSLOW & SHOOMAKER, LLC AND BKIP LLC AGAINST PLAINTIFFS DAIVD SEPARZADEH, EMANUEL SEPARZADEH AND PARAMOUNT INVESTMENT GROUP

a failed business venture in which $5,000,000 in financing was lost.  Upon information and belief, Plaintiff/Cross-Defendant David Separzadeh presented the opportunity to take W&S and/or BKIP public to Toba Capital as a means of conferring a personal benefit on himself by eliminating and/or reducing his debt to that entity.

19.    On or about May 10, 2018, Plaintiffs/Cross-Defendants Emanuel Separzadeh and David Separzadeh, as well as Defendants/Cross-Complainants Healy, Joiner and Rezaie (along with former/dismissed Plaintiff Helios Dayspring) signed a Memorandum of Understanding ("MOU") regarding Cross-Defendants, Rezaie and Dayspring acquiring a 14.5% interest in W&S and BKIP.  A true and correct copy of the MOU is attached as Exhibit B to Plaintiff's Complaint.  The MOU required that the parties execute "definitive agreements" that set forth the final agreements of the parties, but no definitive agreements were ever drafted because the parties never came to a meeting of the minds about the essential contract term of the price to be paid for Cross-Defendants' purchase of an interest in W&S and/or BKIP.

20.    As the parties attempted to draft "definitive agreements," it became apparent that Cross-Defendants were not willing to pay the $5,000,000 purchase price demanded by Cross-Complainants. Instead, Cross-Defendants only wanted to pay $3,290,000 and refused Cross-Complainants' demand that they pay the full $5,000,000 purchase price.

21.    By June of 2017, it became apparent to Cross-Complainants that Cross-Defendants had misrepresented the nature, extent and character of their experience in the cannabis industry.  Cross-Complainants also discovered that the temporary licenses that Cross-Defendants owned and/or possessed for the legal cultivation of cannabis were never renewed or extended and had in fact expired, thus making any cultivation of cannabis at the locations subject to the temporary licenses illegal.  Cross-Defendants also made no effort to obtain licenses for the legal cultivation of cannabis despite their repeated promises to Cross-Complainants to do so, as they preferred to cultivate illegal cannabis that was not subject to regulation by the State of California or other jurisdictions.  Further, Cross-Defendants did not have access and/or control of the Grover Beach property that Cross-Defendants represented could be used for the "Brass Knuckles Campus."

////

22.     By July of 2017, Cross-Complainants and Cross-Defendants terminated their informal relationship and ceased interacting with each other in any capacity.

23.     Shortly after the relationship between Cross-Complainant and Cross-Defendants deteriorated, Cross-Defendant David Separzadeh began making false and defamatory statements to members of Toba Capital, a company that Cross-Complainants had met with to discuss the possibility of making W&S and/or BKIP into a publicly traded corporation.  The false and defamatory statements included advising members of Toba Capital that Cross-Complainants were not competent in business affairs, that Plaintiff/Cross-Defendant David Separzadeh was running the operations of W&S and/or BKIP and that Cross-Defendants would soon be owners of those entities.

24.     The relationship between Toba and Cross-Complainants Healy, Joiner, BKIP and W&S had a probability of conferring a future benefit upon Cross-Complainants Healy, Joiner, BKIP and W&S, as it would have led to BKIP and/or W&S being transitioned into a public traded corporation, thus increasing its gross revenues and profits.  At the point that Cross-Defendant David Separzadeh began interfering with that relationship, substantial plans had been made to transition W&S and/or BKIP into a publicly traded corporation.

25.     Plaintiff/Cross-Defendant David Separzadeh continues to represent to third parties that he is in fact an owner of W&S and/or BKIP.  He further represents that he will soon be the sole owner of those companies and that he runs the business operations of those entities.  Plaintiff/Cross-Defendant David Separzadeh knows that such representations are undoubtedly false, and he only makes those representations with the intent to damage Cross-Complainants' business reputation and relationships.

**FIRST CAUSE OF ACTION**

**RESCISSION FOR FRAUD – CIVIL CODE § 1688(b)(1)**

**BY CROSS-COMPLAINANTS REZAIE, JOINER AND HEALY**

**AGAINST DEFENDANTS DAVID SEPARZADEH, EMANUEL SEPARZADEH AND PIG**

26.     Cross-Complainants hereby restate and incorporate by reference all previous paragraphs as though set forth in full herein.

27.     The consent of Cross-Complainants Rezaie, Joiner and Healy to the MOU was obtained through fraud exercised by Plaintiffs/Cross-Defendants Emanuel Separzadeh and David Separzadeh.

Specifically, as set forth in this Cross-Complaint, Plaintiffs/Cross-Defendants Emanuel Separzadeh and David Separzadeh made multiple intentional misrepresentations, including:

(a)   They owned multiple temporary licenses for the cultivation of cannabis in the Grover Beach and Santa Barbara County area that they promised to extend and/or obtain permanent licenses for the same;

(b)   They had influence with local and state politicians who could assist W&S's business interests;

(c)   They owned and/or controlled property in Grover Beach, California, that could be developed into a "Brass Knuckles Campus," that would serve as a large, commercial property and business operations headquarters for Winslow & Shoomaker;

(d)   They had extensive experience in the cannabis industry, including cultivation, distribution, licensing, regulation and marketing; and

(e)   David Separzadeh represented that he was a very experienced businessman who was on par with CEOs of large corporations.

28.   At the time that Plaintiffs/Cross-Defendants Emanuel Separzadeh and David Separzadeh made the above representations, they knew that the representations were false.

29.   The intentional representations made by Plaintiffs/Cross-Defendants Emanuel Separzadeh and David Separzadeh were made for the purposes of deceiving Cross-Complainants Rezaie, Joiner and Healy about the quality, nature and extent of their experience in the cannabis industry, as well as their ability to assist Healy and Joiner in the operations of W&S and/or BKIP.

30.   The intentional representations made by Plaintiffs/Cross-Defendants Emanuel Separzadeh and David Separzadeh were made for the purposes of inducing Cross-Complainants Rezaie, Joiner and Healy to enter into the MOU.

31.   Cross-Complainants, at the time these representations were made by Cross-Defendants and at the time Cross-Complainants took the actions herein alleged, were ignorant of the falsity of Cross-Defendants' representations and believed the representations to be true.

32.   In reliance on these representations, Cross-Complainants Rezaie, Healy, and Joiner were induced to and did enter into the MOU.

33.     Cross-Complainants are informed and believe and thereon allege that Cross-Defendants, who made the representations herein described, are the authorized agents of Cross-Defendant PIG, and at the time of making the representations herein alleged and at all times herein mentioned, were acting within the course and scope of their agency and authority for Cross-Defendant PIG.

34.     Based on the fraud perpetrated by Plaintiffs/Cross-Defendants Emanuel Separzadeh and David Separzadeh, the MOU should be disaffirmed and/or extinguished because the contract was not properly formed and is therefore unenforceable.

**SECOND CAUSE OF ACTION**

**RESCISSION FOR MISTAKE – CIVIL CODE § 1688(b)(1)**

**BY CROSS-COMPLAINANTS REZAIE, JOINER AND HEALY**

**AGAINST DEFENDANTS DAVID SEPARZADEH, EMANUEL SEPARZADEH AND PIG**

35.     Cross-Complainants hereby restate and incorporate by reference all previous paragraphs as though set forth in full herein.

36.     The consent of Cross-Complainants Rezaie, Joiner and Healy to the MOU was obtained through mistake.   Specifically, Cross-Complainants understood that the purchase price that Plaintiffs/Cross-Defendants would pay for the purchase of an interest in W&S and/or BKIP was $5,000,000.  Cross-Complainants would not accept any purchase price less than $5,000,000.  However, Cross-Defendants understood that the purchase price of an interest in W&S and/or BKIP was $3,290,000 and were unwilling to pay more than that amount.

37.     Based on the mistake about the purchase price, Cross-Complainants Rezaie, Healy and Joiner were induced to, and did, enter into the MOU.

38.     Based on the mistake regarding the purchase price of an interest in W&S and/or BKIP, the MOU should be disaffirmed and/or extinguished because the contract was not properly formed and is therefore unenforceable.

////

////

////

////

CROSS COMPLAINT BY DEFENDANTS MICHAEL HEALY, ALVIN JOINER, RYAN REZAIE, WINSLOW & SHOOMAKER, LLC AND BKIP LLC AGAINST PLAINTIFFS DAIVD SEPARZADEH, EMANUEL SEPARZADEH AND PARAMOUNT INVESTMENT GROUP

**THIRD CAUSE OF ACTION**

**NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

**BY CROSS-COMPLAINANTS HEALY, JOINER, BKIP AND W&S**

**AGAINST CROSS-DEFENDANTS DAVID SEPARZADEH AND PIG**

39.     Cross-Complainants hereby restate and incorporate by reference all previous paragraphs as though set forth in full herein.

40.     Cross-Defendants David Separzadeh and PIG, and each of them, knew of Cross-Complainants Healy, Joiner, BKIP and W&S's existing and/or prospective business relationships with Toba Capital.

41.     Cross-Defendants David Separzadeh and PIG owed a duty to Cross-Complainants Healy, Joiner, BKIP and W&S based on the special relationship between those parties, as well as the nature of the activities that they were engaging in together, to refrain from interfering with their relationship with Toba.  The special relationship between the parties was based on the fact that Cross-Defendants had gained knowledge of BKIP and/or W&S's business operations, were given confidential information by Cross-Complainants Healy and Joiner about BKIP and/or W&S and had access to proprietary and trade secret information from those companies.

42.     Cross-Complainants Healy, Joiner, BKIP and W&S had an existing and/or prospective business relationship with Toba Capital.  That business relationship had the probability of yielding future economic benefits, as Toba Capital was assisting Healy and Joiner with a plan to transition W&S and/or BKIP into publicly traded corporations and, by doing so, greatly increase the value of the company or companies.

43.     Despite knowing of these contracts and existing business relationship, Cross-Defendants David Separzadeh and PIG, and each of them, negligently interfered with this business relationships by making disparaging and false representations to members of Toba Capital about the quality of Cross-Complainants' business acumen and experience, as well as falsely representing that he was in fact running W&S and/or BKIP's business operations, thereby causing permanent harm to the business relationship that Cross-Complainants had developed with Toba Capital.

////

9

44.    Cross-Defendants' interference was unlawful, as it required Cross-Defendants to make intentionally false representations about Cross-Complainants Joiner, Healy, BKIP and W&S, as well as to falsely defame them, all in violation of California law.

45.    It was entirely foreseeable that the interference caused by Cross-Defendants David Separzadeh and PIG would cause harm to Cross-Complainants Healy, Joiner, BKIP and W&S because it would prevent W&S and/or BKIP from becoming a publicly traded corporation and reaping the benefits of that transition.

46.    As a direct result of Cross-Defendants David Separzadeh and PIG's actions and/or omissions, Cross-Complainants were damaged in an amount according to proof due to the loss of the opportunity to transition W&S and/or BKIP into a publicly traded corporation.  Cross-Defendants David Separzadeh and PIG's actions actually and proximately caused damage to Cross-Complainants Healy, Joiner, BKIP and W&S in an amount according to proof.

47.    Cross-Defendants David Separzadeh and PIG's actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of Cross-Complainants, and, therefore, Cross-Complainants are entitled to an award of punitive damages against Cross-Defendants, and each of them, in an amount according to proof.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### BY CROSS-COMPLAINANTS HEALY, JOINER, BKIP AND W&S

### AGAINST CROSS-DEFENDANTS DAVID SEPARZADEH AND PIG

48.    Cross-Complainants hereby restate and incorporate by reference all previous paragraphs as though set forth in full herein.

49.    Cross-Complainants Healy, Joiner, BKIP and W&S had an existing and/or prospective business relationship with Toba Capital.  That business relationship had the probability of yielding future economic benefits, as Toba Capital was assisting Healy and Joiner with a plan to transition W&S and/or BKIP into publicly traded corporations and, by doing so, greatly increase the value of the company or companies.

////

50.    Cross-Defendants David Separzadeh and PIG, and each of them, knew of Cross-Complainants Healy, Joiner, BKIP and W&S's existing business relationships with Toba Capital.

51.    Despite knowing of these contracts and existing business relationship, Cross-Defendants David Separzadeh and PIG, and each of them, intentionally interfered with this business relationships by making disparaging and false representations to members of Toba Capital about the quality of Cross-Complainants' business acumen and experience, as well as falsely representing that he was in fact running W&S and/or BKIP's business operations, thereby causing permanent harm to the business relationship that Cross-Complainants had developed with Toba Capital.  These acts were committed by Cross-Defendants David Separzadeh and PIG with the design to disrupt the economic relationship between Cross-Complainants Healy, Joiner, BKIP, W&S and Toba Capital and to cause Toba Capital to withdraw from the relationship, which it in fact did.

52.    Cross-Defendants knew that their interference was certain, or substantially certain, to occur because of their actions.  Further, their actions were substantially certain to result in interference.

53.    Cross-Defendants' interference was unlawful, as it required Cross-Defendants to make intentionally false representations about Cross-Complainants Joiner, Healy, BKIP and W&S, as well as to falsely defame them, all in violation of California law.

54.    The interference by Cross-Defendants David Separzadeh and PIG caused an actual disruption of Cross-Complainants Healy, Joiner, BKIP and W&S's business relationship with Toba Capital and destroyed their opportunity to transition W&S and/or BKIP into a publicly traded corporation with Toba Capital's assistance, thus reducing the value of those companies and causing economic damages.

55.    Cross-Complainants Healy, Joiner, BKIP and W&S suffered economic harm caused by Cross-Defendants David Separzadeh and PIG's intentional interference in an amount to according to proof.

56.    Cross-Defendants David Separzadeh and PIG's actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of Cross-Complainants, and, therefore, Cross-Complainants are entitled to an award of punitive damages against Cross-Defendants, and each of them, in an amount according to proof.

**PRAYER**

Wherefore, Cross-Complainants pray for judgment against Cross-Defendants, as follows:

<u>FIRST CAUSE OF ACTION</u>

1.    Rescission of the Memorandum of Understanding signed May 10, 2018; and

2.    Costs of suit and for any further relief that the Court deems just and proper.

<u>SECOND CAUSE OF ACTION</u>

1.    Rescission of the Memorandum of Understanding signed May 10, 2018; and

2.    Costs of suit and for any further relief that the Court deems just and proper.

<u>THIRD CAUSE OF ACTION</u>

1.    Economic damages according to proof;

2.    Punitive damages sufficient to deter such conduct in the future; and

3.    Costs of suit and for any further relief that the Court deems just and proper.

<u>FOURTH CAUSE OF ACTION</u>

1.    Economic damages according to proof;

2.    Punitive damages sufficient to deter such conduct in the future; and

3.    Costs of suit and for any further relief that the Court deems just and proper.

Dated:  June 5, 2019                                    **RICHIE LITIGATION, P.C.**

_____
Darren Richie, Esq.
Antonio Castillo III, Esq.
Attorneys for Defendants/Cross-
Complainants *Joiner, Rezaie, Winslow &
Shoomaker, LLC, and BKIP, LLC*

CROSS COMPLAINT BY DEFENDANTS MICHAEL HEALY, ALVIN JOINER, RYAN REZAIE, WINSLOW &
SHOOMAKER, LLC AND BKIP LLC AGAINST PLAINTIFFS DAIVD SEPARZADEH, EMANUEL SEPARZADEH
AND PARAMOUNT INVESTMENT GROUP

# EXHIBIT N

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1                                                    ETAS ID: TM777934
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT OF THE ENTIRE INTEREST AND THE GOODWILL |

### CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| BKIP LLC | | 12/28/2022 | Limited Liability Company: CALIFORNIA |

### RECEIVING PARTY DATA

| | |
|---|---|
| Name: | HERO BRANDS, INC. |
| Street Address: | 3972 BARRANCA PKWY, SUITE J231 |
| City: | IRVINE |
| State/Country: | CALIFORNIA |
| Postal Code: | 92606 |
| Entity Type: | Corporation: DELAWARE |

### PROPERTY NUMBERS Total: 3

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 5476356 | BRASS KNUCKLES LOS ANGELES EST 1996 |
| Registration Number: | 5476357 | BRASS KNUCKLES LOS ANGELES EST 1996 |
| Registration Number: | 5541624 | BRASS KNUCKLES |

### CORRESPONDENCE DATA

**Fax Number:**            9498556371

***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***

**Phone:**                 949-855-1246
**Email:**                 gdelgadillo@stetinalaw.com
**Correspondent Name:**    STETINA BRUNDA GARRED & BRUCKER
**Address Line 1:**        75 ENTERPRISE, SUITE 250
**Address Line 4:**        ALISO VIEJO, CALIFORNIA 92656

| NAME OF SUBMITTER: | ERIC L. TANEZAKI |
|---|---|
| SIGNATURE: | /Eric L. Tanezaki/ |
| DATE SIGNED: | 01/03/2023 |

**Total Attachments: 3**
source=Assignment.TM.Registration.BK to Hero Brands_fully executed - 12.28.2022#page1.tif
source=Assignment.TM.Registration.BK to Hero Brands_fully executed - 12.28.2022#page2.tif
source=Assignment.TM.Registration.BK to Hero Brands_fully executed - 12.28.2022#page3.tif

*(side margin:)* CH $90.00   5476356

## TRADEMARK ASSIGNMENT

WHEREAS, BKIP LLC, a California limited liability company, having a mailing address at 10880 Wilshire Blvd., Suite 1000, Los Angeles, CA 90024 (hereinafter "ASSIGNOR"), has adopted, used, and is using marks which registered as:

| U.S. Registration No. | Registration Date | Mark | Goods/Services |
|---|---|---|---|
| 5,476,356 | May 22, 2018 | BRASS KNUCKLES | Class 025: clothing; T-shirts; hoodies; headwear |
| 5,476,357 | May 22, 2018 | BRASS KNUCKLES | Class 025: clothing; T-shirts; hoodies; headwear |
| 5,541,624 | August 14, 2018 | BRASS KNUCKLES | Class 009: batteries Class 010: vaporizers for medical purposes; atomizers sold empty for medical use; vapor cartridges sold empty for medical use Class 021: glass jars |

(hereinafter "marks"); and

WHEREAS, Hero Brands, Inc., a Delaware corporation, having a mailing address of business at 3972 Barranca Pkwy, Suite J231, Irvine, CA 92606, (hereinafter "ASSIGNEE"), is desirous of acquiring said marks and the registrations thereof;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, said ASSIGNOR does hereby assign unto said ASSIGNEE, all right, title, and interest in and to said marks, together with the goodwill of the business symbolized by the marks in the above-identified registrations thereof, common law rights and copyright rights therein, together with the right to bring actions and collect damages for any past infringement of said marks.

IN TESTIMONY WHEREOF, ASSIGNOR hereunto sets its hand and seal this 28 day of December, 2022

State of Nevada
County of Clark

ASSIGNOR

Subscribed and sworn to before me this 28 day of December, 2022, by Alvin Nathaniel Joiner

Topanga Wurth, Notary Public

By: _____
Name: Michael Healy
Title: Member

By: _____
Name: Alvin Joiner
Title: Member

TOPANGA WURTH
Notary Public, State of Nevada
No. 21-3302-01
My Appt. Exp. Dec. 2, 2025

## TRADEMARK ASSIGNMENT

WHEREAS, BKIP LLC, a California limited liability company, having a mailing address at 10880 Wilshire Blvd., Suite 1000, Los Angeles, CA 90024 (hereinafter "ASSIGNOR"), has adopted, used, and is using marks which registered as:

| U.S. Registration No. | Registration Date | Mark | Goods/Services |
|---|---|---|---|
| 5,476,356 | May 22, 2018 | BRASS KNUCKLES | Class 025: clothing; T-shirts; hoodies; headwear |
| 5,476,357 | May 22, 2018 | BRASS KNUCKLES | Class 025: clothing; T-shirts; hoodies; headwear |
| 5,541,624 | August 14, 2018 | BRASS KNUCKLES | Class 009: batteries Class 010: vaporizers for medical purposes; atomizers sold empty for medical use; vapor cartridges sold empty for medical use Class 021: glass jars |

(hereinafter "marks"); and

WHEREAS, Hero Brands, Inc., a Delaware corporation, having a mailing address of business at 3972 Barranca Pkwy, Suite J231, Irvine, CA 92606, (hereinafter "ASSIGNEE"), is desirous of acquiring said marks and the registrations thereof;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, said ASSIGNOR does hereby assign unto said ASSIGNEE, all right, title, and interest in and to said marks, together with the goodwill of the business symbolized by the marks in the above-identified registrations thereof, common law rights and copyright rights therein, together with the right to bring actions and collect damages for any past infringement of said marks.

IN TESTIMONY WHEREOF, ASSIGNOR hereunto sets its hand and seal this 28 day of December , 2022

ASSIGNOR

By: _____
Name: Michael Healy
Title: Member

By: _____
Name: Alvin Joiner
Title: Member

# CALIFORNIA CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                              )

County of _San Diego_                         )

On _December 28, 2022_ before me, _THUY NGUYEN, NOTARY PUBLIC_ ,
                                                   (here insert name and title of the officer)

personally appeared _MICHAEL HEALY_

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Thuy Nguyen_

THUY NGUYEN
Commission No. 2319671
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
Commission Expires January 24, 2024

(Seal)

## Optional Information

Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons relying on the attached document.

Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a document titled/for the purpose of ___TRADEMARK ASSIGNMENT___
___BKIP LLC___

containing __01__ pages, and dated _December 28, 2022_

The signer(s) capacity or authority is/are as:
☐ Individual(s)
☐ Attorney-in-Fact
☒ Corporate Officer(s) ___MEMBER___
                              Title(s)

☐ Guardian/Conservator
☐ Partner - Limited/General
☐ Trustee(s)
☒ Other: _____

representing: ___MEMBER___
              Name(s) of Person(s) or Entity(ies) Signer is Representing

Additional Information

Method of Signer Identification

Proved to me on the basis of satisfactory evidence:
○ form(s) of identification   ○ credible witness(es)

Notarial event is detailed in notary journal on:
        Page # _____   Entry # _____

Notary contact: _____
Other
☐ Additional Signer(s)    ☐ Signer(s) Thumbprint(s)
☐ _____

© Copyright 2007-2017 Notary Rotary, PO Box 41400, Des Moines, IA 50311-0507. All Rights Reserved.    Item Number 1012

**TRADEMARK**
**REEL: 007953 FRAME: 0202**

RECORDED: 01/03/2023

# EXHIBIT O

DocuSign Envelope ID: 79B7756E-3991-4A94-838B-34FE1B858820

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July [●], 2023, is entered into by and among, (i) [SOLID STRIKE LLC], a Delaware limited liability company ("Buyer"), (ii) BKIP LLC, a California limited liability company ("Seller"), (iii) Winslow & Shoomaker, LLC, a California limited liability company ("Equityholder"), (iv) AIDIW LLC, a Delaware limited liability company ("AIDIW"), (v) Hitmarker LLC, a Delaware limited liability company ("Hitmarker" and together with AIDIW, the "Owners" and each an "Owner"), (vi) Michael Healy ("Healy"), and (vii) Alvin Joiner ("Joiner" and together with Healy, the "Principals" and each a "Principal"). Capitalized terms used in this Agreement have the meanings given to such terms herein.

## RECITALS

WHEREAS, Seller is engaged in the business of marketing and branding certain cannabis related products with the intellectual property of Seller that are sold through licensed cannabis businesses (the "Business");

WHEREAS, Equityholder is the sole member of Seller, and the Owners are the only two members of Equityholder;

WHEREAS, through authorized company actions, the Principals may act and bind the Owners (Seller, Equityholder, Owners and Principals, collectively, the "Seller Group");

WHEREAS, the Seller Group wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth herein; and

WHEREAS, Exhibit A of this Agreement contains definitions and/or cross-references for certain defined terms used in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01  Purchase and Sale of Assets.** On and subject to the terms of this Agreement, at the Closing, the Seller shall sell and deliver to Buyer, free and clear of all Liens, and Buyer shall purchase and accept from the Seller, the Acquired Assets, in exchange for (a) the Total Consideration, as adjusted pursuant to this Agreement, and (b) the assumption by Buyer of the Assumed Liabilities.

**Section 1.02  The Acquired Assets.** For purposes of this Agreement, the "Acquired Assets" means all of the assets useable in the Business, other than the Excluded Assets, including, without limitation, the following:

(a)  all Intellectual Property Rights that are either (i) listed on Schedule 1.02(a), (ii) are in any way related to the intellectual property in clause (i), (iii) all goodwill related thereto; and (iv) all rights to bring claims and enforce such Intellectual Property Rights, including, without limitation, against counterfeiters (collectively, the "Seller Intellectual Property");

DocuSign Envelope ID: 79B7756E-8904-4A04-838B-34FE1B858820

(b)      all originals or copies of files, books and records, invoices, ledgers, sales acknowledgments and other data of the Seller relating to the Business or the Acquired Assets;

(c)      all choses in action, causes of action, claims, and demands of the Seller (whether known or unknown, matured or unmatured, accrued or contingent), as related to the Business or the Acquired Assets);

(d)      all marketing and advertising materials, the use of any telephone numbers and any websites or other internet content, including all social media accounts, useable in or related to the operation of the Business;

(e)      all inventory, finished goods, raw materials, work in progress, merchandising and display assets, hardware, batteries, apparel or other tangible items, supplies, parts, and other inventories, including the Seller Intellectual Property, useable in or related to the operation of the Business;

(f)      all goodwill of the Seller as a going concern to the extent related to the Acquired Assets;

(g)      to the extent transferable, all express or implied guarantees, warranties, representations, covenants, indemnities and similar rights in favor of the Seller in connection with the Business or the Acquired Assets (other than hereunder); and

(h)      all customer Information, vendor Information and all other Information to the extent related to the Acquired Assets.

**Section 1.03   Excluded Assets.** The Acquired Assets shall not include all of the other assets of the Company not included as Acquired Assets including (the "Excluded Assets"):

(a)      the organizational documents, seals, minute books and other documents relating exclusively to the organization, maintenance and existence of the Seller as a legal entity, including taxpayer and other identification numbers; Tax Returns, Tax information and Tax records; auditors' work papers; and books and records related exclusively to the Excluded Assets or the Excluded Liabilities;

(b)      all cash, certificates of deposit, bank deposits and accounts, negotiable instruments, marketable securities, investments and other cash equivalents of any type, together with all accrued but unpaid interest thereon;

(c)      any rights that accrue or will accrue to the Seller Group under this Agreement; and

(d)      any specified assets set forth on Schedule 1.03(d).

**Section 1.04   Assumed Liabilities.** At the Closing, Buyer shall assume only Liabilities related to the Acquired Assets solely to the extent arising on or after the Closing Date (the "Assumed Liabilities"):

**Section 1.05   Excluded Liabilities.** Notwithstanding anything in this Agreement to the contrary, Buyer shall not assume or be obligated to pay, perform or otherwise discharge any Excluded Liabilities. The term "Excluded Liabilities" shall mean all Liabilities, other than the Assumed Liabilities, including the following Liabilities:

2

(a)     all Liabilities for or with respect to Taxes of the Seller or any of its Affiliates (including the Equityholder);

(b)     all Liabilities for or with respect to non-compliance with Laws relating to the Business;

(c)     all Liabilities to the extent arising from or relating to any Excluded Asset;

(d)     all Transaction Expenses of the Seller Group and their Affiliates;

(e)     all Liabilities arising out of or in connection with any indebtedness of the Seller Group or any of their Affiliates;

(f)     all Liabilities of any Person of the Seller Group or any of their Affiliates not arising from or relating to the Business; and

(g)     any claim relating to all of the foregoing and all associated fees, costs and expenses.

**Section 1.06   Purchase Price and Purchase Payments.**

(a)     *Total Consideration*: The aggregate consideration for the Acquired Assets (the "Total Consideration") shall mean the following:

(i)     $724,445.65 (the "Purchase Price") payable to the Seller at Closing by wire transfer of immediately available funds to the account listed in the wire transfer instructions provided by Seller to Buyer (the "Closing Cash Payment"); *plus*

(ii)     The assumption of the Assumed Liabilities.

(b)     *Purchase Payments*. The Seller Group covenants and agrees that the Closing Cash Payment payable to Seller, shall be delivered to Joiner (or Joiner's designee). Following the delivery of the Closing Cash Payment from Buyer to Joiner, each Person within the Seller Group agrees, on behalf of himself, herself or itself, that Buyer's obligations to make payment shall have been fulfilled, and each such Person covenants, on behalf of himself, herself or itself, that such Person shall make no claim against Buyer for failure of the Closing Cash Payment to be distributed within the Seller Group as contemplated in this Section 1.06.

**Section 1.07   Allocation of Purchase Price.** The Purchase Price and the Assumed Liabilities shall be allocated among the Acquired Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule set forth on Schedule 1.07 (the "Allocation Schedule"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller shall file all returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("Tax Returns") in a manner consistent with the Allocation Schedule.

**Section 1.08   Third-Party Consents.** To the extent that Seller's rights under any Acquired Asset may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its best efforts to obtain any such

DocuSign Envelope ID: 70B7756E-8994-4A94-838B-34FE1B858820

required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Acquired Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by Law and the Acquired Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Acquired Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

**ARTICLE II**
**CLOSING**

**Section 2.01    Time and Place of Closing.** Consummation of the transactions contemplated by this Agreement (the "Closing") will be held by electronic exchange of documents effective as of 4:00 p.m. PST on the date hereof (the "Closing Date").

**Section 2.02    Seller Deliveries.** At the Closing, the Seller Group shall deliver, or cause to be delivered, to Buyer the following (the "Seller Closing Deliverables"):

(a)    duly executed counterparts of this Agreement, by each Person in the Seller Group;

(b)    a duly executed counterpart of a Trademark Assignment (the "Trademark Assignment") in the form of Exhibit B;

(c)    a duly executed counterpart of a Domain Name Assignment (the "Domain Name Assignment") in the form of Exhibit C;

(d)    evidence of releases of all Liens relating to the Acquired Assets including those set forth in Schedule 2.02(d);

(e)    all other documents, instruments and writings required to be delivered by the Seller at or prior to the Closing Date pursuant to this Agreement and the other Purchase Documents, all other documents, instruments, declarations, affidavits and writings reasonably requested by Buyer that are reasonably necessary to assign, convey, transfer and deliver to Buyer, good and valid title to the Acquired Assets.

**Section 2.03    Buyer Deliveries.** At the Closing, Buyer shall deliver, or cause to be delivered, to Seller the following (the "Buyer Closing Deliverables"):

(i)    the Closing Cash Payment by wire transfer in immediately available funds;

(ii)    a duly executed counterpart of the Trademark Assignment;

(iii)    a duly executed counterpart of the Domain Name Assignment;

(iv)    any reductions, if then known at the time of Closing, to the Liability Payment that are then otherwise paid to Seller; and

(v)    a duly executed counterpart of this Agreement.

4

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller Group jointly and severally represent and warrant to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01    Organization and Authority of Seller.** Seller is validly existing and in good standing under the Laws of its state of formation. Seller has furnished to Buyer a complete and accurate copy of Seller's current certificate of formation, limited liability company agreement or similar governing documents, as amended or restated.  Seller is not in violation of any of the provisions of any such governing documents. Seller is duly qualified and licensed as a foreign entity in each of the jurisdictions in which the nature of the business conducted by the Seller makes such qualification or licensing necessary. The Seller has no subsidiaries or Affiliates that own or otherwise utilize assets used in the operation of the Business. The Equityholder holds beneficially and of record all outstanding equity of the Seller, free and clear of all Liens, and no Person in the Seller Group owns or otherwise utilizes, or makes any claim to own, assets used in the operation of the Business, including the Acquired Assets.

**Section 3.02    No Violation.** Except as provided on Schedule 3.02, the execution of the Purchase Documents by the Seller Group and the performance of all obligations contained therein does not and will not: (a) conflict with the Seller's governing documents, (b) violate any Laws, (c) result in the creation or imposition of any Lien (other than as contemplated by the Purchase Documents), (d) result in a breach, default, termination, acceleration or penalties under any contract, permit or other instrument to which any member of the Seller Group is a party or any of their assets or properties is bound, or (e) require the consent of, filing with or notice to any third party, including a Regulatory Authority.

**Section 3.03    Power and Authority; Validity; Enforceability.** The Seller Group has the power, authority and/or capacity necessary to enter into and perform his, her or its obligations under the Purchase Documents to which he, she or it is a party.  All instruments or documents executed by the Seller Group in connection with the Purchase Documents have been duly authorized, executed and delivered and constitute valid and binding obligations of the Seller Group, enforceable in accordance with their terms except as such enforceability may be subject to bankruptcy, moratorium, insolvency, reorganization, arrangement, voidable preference, fraudulent conveyance and other similar Laws relating to or affecting the rights of creditors and except as the same may be subject to the effect of general principles of equity (the "Bankruptcy and Equity Exceptions").  No other corporate (including member) proceedings on the part of the Seller are necessary to authorize the execution, delivery or performance of the Purchase Documents or the consummation of the transactions contemplated thereby.

**Section 3.04    Title to and Condition of the Acquired Assets.** Seller has good and valid title to all the Acquired Assets, free and clear of Liens. The Acquired Assets include all the rights, properties, interests in properties, and assets useable under the conduct of the Business. The Seller has not granted any power of attorney affecting the Acquired Assets.

**Section 3.05    Seller Intellectual Property.**

(a)    Schedule 1.02(a) contains a complete and accurate list of all Intellectual Property Rights that are in the name of, owned by, or used by, the Seller, anywhere in the world, in whole or in part, relating to the Seller Intellectual Property, except for Intellectual Property Agreements, and are: (i) the subject of a pending application or issued registration; and (ii) unregistered or unapplied for material unregistered Intellectual Property Rights (collectively the "Owned Seller Intellectual Property").

5

DocuSign Envelope ID: 79B7756E-8994-4A94-838B-34FE1B858820

(b)    Schedule 3.05(b) sets forth all material license agreements or other contracts pursuant to which the Seller has the right to use, possess, market, sell, license, practice or otherwise exploit any third party Intellectual Property Rights other than licenses for off-the-shelf software that is generally commercially available (the "Inbound Licenses"). Schedule 3.05(b) sets forth all license agreements or other contracts to which the Seller is a party and pursuant to which any Person is authorized to use, possess, market, sell, license, practice or otherwise exploit any of the Seller Intellectual Property Rights (the "Outbound Licenses" and, collectively with the Inbound Licenses, the "Intellectual Property Agreements"). All Seller Intellectual Property is identified on Schedules 1.02(a) and 3.05(b). The Seller owns, or has the right to use, all rights, title and interests in and to all the Seller Intellectual Property, free and clear of all Liens and licenses other than the Outbound Licenses and Permitted Encumbrances. Except as set forth on Schedule 3.05(b), there are no instruments, licenses, contracts or other agreements governing or relating to any Seller Intellectual Property. The Seller Intellectual Property constitutes all of the Intellectual Property Rights necessary for the conduct of the Business as presently conducted.

(c)    The Seller owns and possesses the entire title and interest in all Intellectual Property Rights created or developed by, for or under the Seller Groups' direction or supervision, as related to the Business, and all Persons that have participated in the creation or development of any such Intellectual Property Rights have executed and delivered to the Seller a valid and enforceable agreement (i) providing for the non-disclosure by such Person of any confidential information of the Seller, and (ii) providing for the present assignment by such Person to the Seller of any Intellectual Property Rights arising out of such Person's employment by, engagement by or contract with the Seller.

(d)    All of Owned Seller Intellectual Property is valid and enforceable and there is no loss or expiration of any Intellectual Property Rights that is pending or, to the Knowledge of the Seller Group, threatened. None of the Owned Seller Intellectual Property has been misused, no claim by any third party contesting the validity, enforceability, use or ownership of any of the Seller Intellectual Property has been made, is currently outstanding or is threatened, and there are no grounds for the same. None of the Seller Group nor the Business has infringed, misappropriated or otherwise conflicted with, and neither the Seller Group nor the Business currently infringes, misappropriates or otherwise conflicts with, the material Intellectual Property Rights of any third party, the Seller Group is not aware of any facts that indicate a likelihood of any of the foregoing and the Seller Group has not received any notices regarding any of the foregoing (including any demands or offers to license any Intellectual Property Rights from any third party). To the Knowledge of the Seller Group, no third party has infringed, misappropriated or otherwise conflicted with any of the Seller Intellectual Property and no Person within the Seller Group is aware of any facts that indicate a likelihood of any of the foregoing.  Immediately subsequent to the Closing, the Seller Intellectual Property will be owned or available for use by Buyer on terms and conditions identical to those under which the Seller owned or used the Seller Intellectual Property immediately prior to the Closing.

(e)    All registered Owned Seller Intellectual Property complies in all material respects with applicable formal legal requirements necessary to maintain such Intellectual Property Rights before the applicable registrar. No cancellation, termination, expiration or abandonment of any Seller Intellectual Property (except with regard to the natural expiration or termination at the end of the full possible term, including extensions and renewals for

**Section 3.06    Brokers and Finders.** Except as disclosed on Schedule 3.06, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the

transactions contemplated by this Agreement or any Purchase Document based upon arrangements made by or on behalf of the Seller Group.

      **Section 3.07   Full Disclosure.** No Purchase Document (including the representations and warranties contained therein), nor any of the schedules, exhibits or certificates to be delivered in connection therewith contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained herein or therein not misleading. To the Seller Groups' Knowledge, there is no fact which the Seller Group has not disclosed to Buyer in the Purchase Documents which has had, will have or would reasonably be expected to have a Material Adverse Effect

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

      Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

      **Section 4.01    Authority.** Buyer has all requisite power and authority to execute and deliver this Agreement and the other Purchase Documents to which it is a party and to perform its obligations hereunder and thereunder. This Agreement has been, and each of the other Purchase Documents to which Buyer is a party has been or prior to the Closing will be, duly and validly executed and delivered by Buyer and (assuming due authorization, execution and delivery by the Seller Group) constitute valid and binding obligations of Buyer, enforceable against Buyer in accordance with its terms subject to the Bankruptcy and Equity Exceptions.

      **Section 4.02    No Violation.** Neither the execution and delivery by Buyer of this Agreement or the other Purchase Documents, nor the consummation by Buyer of the transactions contemplated hereby or thereby, will (a) conflict with the governing documents or any third party agreements of Buyer or its Affiliates, (b) require the consent of, filing with, or notice to any third party, including any Regulatory Authority or (c) violate any applicable Laws.

      **Section 4.03    Brokers and Finders.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Purchase Document based upon arrangements made by or on behalf of Buyer.

# ARTICLE V
## COVENANTS

      **Section 5.01    Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause it's or their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("Representatives") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by Order or Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as

promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

   **Section 5.02 Non-disparagement.** Each of the Parties agrees and covenants, on behalf of itself and its Affiliates, that he, she nor it will, at any time, directly or indirectly, make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Business or any other Party (including Affiliates, members, and principals) or any of their employees, officers, equityholders, members or advisors, or any managers or members of their boards. This <u>Section 5.03</u> does not, in any way, restrict or impede such Party from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable Law or regulation or a valid order of a court of competent jurisdiction or Regulatory Authority, provided that such compliance does not exceed that required by the Law, regulation, or order. Such Party shall promptly provide written notice of any such order to Buyer.

   **Section 5.03 Public Announcements.** Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

   **Section 5.04 Further Assurances.** Following the Closing, upon the reasonable request of the Seller (on behalf of the Seller Group), on the one hand, or Buyer, on the other hand, the other party shall prepare, execute and deliver such other agreements, instruments, and other documents, and take and perform such other actions, as may be reasonably necessary or appropriate to effectuate the purposes and intent of this Agreement and to consummate the transactions contemplated hereby. In this regard, the Seller Group and Buyer shall, and shall cause their respective Affiliates to, execute and deliver all such further instruments, and shall take such further actions, as may be reasonably necessary or appropriate to transfer the Acquired Assets and to assure the assumption by Buyer from the Seller of the Assumed Liabilities and to otherwise make effective the transactions contemplated hereby.

   **Section 5.05 Contingent Future Equity.** In the event the Company enters into a capital financing, equity transaction or partnership for the development and sale of Brass Knuckles related products with the Serruya Family or their affiliated entities, the Company and Seller will in good faith negotiate an appropriate equity position (for example, 5%) in the Company for Joiner. The obligations of this Section 5.05 shall expire twenty-four (24) months from the Closing.

**ARTICLE VI**
**INDEMNIFICATION**

   **Section 6.01 Agreement of Seller Group to Indemnify.** Subject to the terms and conditions of this <u>Article VI</u>, following the Closing, the Seller Group jointly and severally agrees to indemnify and hold harmless Buyer and its respective officers, managers, members, partners, employees, agents and other related Persons (all of whom are intended to be third-party beneficiaries under this <u>Article VI</u>) ("<u>Buyer Indemnitees</u>") from all Losses relating to or incurred by the Buyer Indemnitees arising out of:

     (a) the breach of any representation or warranty of any Person within the Seller Group contained in or made pursuant to any Purchase Document;

8

DocuSign Envelope ID: 79B7756E-8904-4A04-838B-34FE1B858820

(b)     the breach of any covenant or agreement of any Person within the Seller Group contained in or made pursuant to any Purchase Document; and

(c)     any Excluded Liability or any Excluded Asset.

The obligations set forth in this <u>Section 6.01</u> shall include indemnification against any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including legal fees and expenses) incident to any of the foregoing or to the enforcement of this <u>Section 6.01</u>.

**Section 6.02   Agreement of Buyer to Indemnify.** Subject to the terms and conditions of this <u>Article VI</u>, following the Closing, Buyer agrees to indemnify and hold harmless the Seller and its respective officers, managers, members, partners, employees, agents and other related Persons (each of whom is intended to be a third-party beneficiary under this <u>Article VI</u>) ("<u>Seller Indemnitees</u>") from all Losses asserted against, relating to or incurred by Seller Indemnitees arising out of:

(a)     the breach of any representation or warranty of Buyer contained in or made pursuant to any Purchase Document;

(b)     the breach of any covenant or agreement of Buyer contained in or made pursuant to any Purchase Document; and

(c)     any Assumed Liability.

The obligations set forth in this <u>Section 6.02</u> shall include indemnification against any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including legal fees and expenses) incident to any of the foregoing or to the enforcement of this <u>Section 6.02</u>.

**Section 6.03   Exclusive Remedy.** From and after Closing, except in the case of fraud, willful and intentional breach or claims for equitable relief, the remedies specified in this <u>Article VI</u> shall be the sole and exclusive remedies to which a Buyer Indemnitee or a Seller Indemnitee is entitled with regard to any Losses. Notwithstanding the foregoing, the parties may apply to a court of competent jurisdiction for a temporary restraining order, preliminary injunction or other interim or conservatory relief, or for a permanent injunction or other equitable relief without breach of this provision.

# ARTICLE VII
## MISCELLANEOUS

**Section 7.01   Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 7.02   Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the

following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

**If to Buyer:**

                                   Email:
                                   Attention:

with a copy to:                Buchalter
                                   1000 Wilshire Boulevard, Suite 1500
                                   Los Angeles, California 90017
                                   Email: jweitz@buchalter.com
                                   Attention: Jeremy Weitz, Esq.

**If to Joiner or Hitmarker, LLC:**

                                   Alvin Joiner
                                   Email: masstaminded@me.com
                                   Attention:

with a copy to:                JK Legal & Consulting, LLC
                                   9205 West Russell Rd., Suite 240
                                   Las Vegas, NV 89148
                                   Email: jkahn@jk-legalconsulting.com
                                   Attention: Jared Kahn, Esq.

      **Section 7.03    Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

      **Section 7.04    Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

      **Section 7.05    Entire Agreement.** This Agreement and the other Purchase Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Purchase Documents, the schedules (other than an exception expressly set forth as such in the schedules), the statements in the body of this Agreement will control.

      **Section 7.06    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement shall not be assignable by any party without the written consent of the other parties; *provided that* Buyer may assign this Agreement to (a) an Affiliate of Buyer, (b) for collateral security purposes to any lender of the Buyer or its Affiliates, and (c) the acquirer of all or substantially all of the assets or a majority of the equity

of Buyer or its Affiliate, so long as any such Assignee of Buyer agrees to be bound by the obligations of Buyer herein.

**Section 7.07    Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by the parties hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.08    Governing Law; Exclusive Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. Each party submits to the exclusive jurisdiction and venue of the state and federal courts located in the State of California. Each party agrees not to commence any legal proceedings related hereto except in such courts.

(b)    **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT OF THIS AGREEMENT AND THE PURCHASE DOCUMENTS.**

**Section 7.09    Specific Performance.** The parties agree that immediate and irreparable damage would occur for which monetary damages, even if available, would not be an adequate remedy if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached.  Accordingly, the parties agree that, if for any reason any party shall have failed to perform its obligations under this Agreement or otherwise breached this Agreement, then the party seeking to enforce this Agreement against such nonperforming party shall be entitled to specific performance and the issuance of immediate injunctive and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of proving the inadequacy of money damages as a remedy. The parties further agree to waive any requirement for the posting of any bond in connection with the obtaining of any such injunctive or other equitable relief, this being in addition to and not in limitation of any other remedy to which they are entitled at Law or in equity

**Section 7.10    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Signature page follows*]

11

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER GROUP:**

**BKIP LLC, a California limited liability company**

SELLER

By _Mike Healy_
NAME: Mike Healy
TITLE: Manager

EQUITYHOLDER

**Winslow & Shoomaker, LLC, a California limited liability company**

By _Mike Healy_
NAME: Mike Healy
TITLE:  Manager

OWNER

**Hitmaker LLC, a Delaware limited liability company**

By _Alvin Joiner_
NAME: Alvin Joiner
TITLE: Manager

_Alvin Joiner_

PRINCIPAL
Alvin Joiner

OWNER

**AIDIW LLC, a Delaware limited liability company**

By _Mike Healy_
NAME: Mike Healy
TITLE: Manager

_Mike Healy_

PRINCIPAL
Michael Healy

*[Signature Page to Asset Purchase Agreement]*

      **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**BUYER:**

**[Solid Strike LLC, a Delaware limited liability company]**

By: *Matt Gless*

NAME: Matt Gless

TITLE: partner

*[Signature Page to Asset Purchase Agreement]*

BN 77207304v3

# EXHIBIT A

## DEFINITIONS

(a)     Except as otherwise provided herein, the capitalized terms set forth below shall have the following meanings:

(i)     "Affiliate" of any Person means any Person that controls, is controlled by, or is under common control with such Person; provided that each Person within the Seller Group shall be deemed to be an Affiliate of each of the other Persons of the Seller Group, except that Healy and AIDIW shall not be considered Affiliates for purposes of the restrictions set forth in Section 5.02 in this Agreement. As used herein, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or other interests, by contract or otherwise.

(ii)     "Law" means a code, directive, law (including common law), ordinance, regulation, reporting or licensing requirement, rule, statute applicable to a Person or its assets, or business, including those promulgated, interpreted or enforced by a Regulatory Authority.

(iii)     "Liability" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the ordinary course of business) of any type, secured or unsecured, whether accrued, absolute or contingent, direct or indirect, liquidated or unliquidated, matured or unmatured, known or unknown.

(iv)     "Lien" means any conditional sale agreement, covenant, default of title, easement, encroachment, encumbrance, hypothecation, infringement, lien, mortgage, pledge, reservation, restriction, right of way, security interest, title retention or other security arrangement, or any adverse right or interest, charge, or claim of any nature whatsoever of, on, or with respect to any property or property interest, other than Permitted Encumbrances or the Assumed Liabilities.

(v)     "Loss" means any and all direct or indirect litigation, payments, obligations, recoveries, deficiencies, fines, penalties, interest, assessments, losses, diminution in the value of assets, damages, punitive damages, Liabilities, costs, expenses (including (a) interest, penalties and reasonable attorneys' fees and expenses, (b) reasonable attorneys' fees and expenses necessary to enforce rights to indemnification hereunder, and (c) consultant's fees and other costs of defense or investigation), and interest on any amount payable to a third party as a result of the foregoing, whether accrued, absolute, contingent, known, unknown, or otherwise as of the Closing Date or thereafter.

(vi)     "Material Adverse Effect" means any event, change, development, occurrence or effect that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to the Business or the Acquired Assets, taken as a whole.

(vii)     "Information" means information or documentation owned by the Seller, including financial data, business plans, personnel information (to the extent transferrable under applicable

*[Exhibit A to Asset Purchase Agreement]*

Law), drawings, samples, devices, trade secrets, technical information, results of research and other data in either oral or written form.

(viii)  "Intellectual Property Rights" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications, patent disclosures, invention disclosures and inventions (whether or not patentable and whether or not reduced to practice) and any reissue, continuation, continuation-in-part, division, revision, extension or reexamination thereof; (ii) trademarks, service marks, trade dress, trade names, corporate names, logos and slogans (and all translations, adaptations, derivations and combinations of the foregoing), Internet domain names and social media accounts together with all goodwill associated with each of the foregoing; (iii) copyrights, copyrightable works and mask works; (iv) registrations and applications for registration for any of the foregoing; (v) trade secrets, Information and confidential information (including ideas, formulae, compositions, know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, financial, business and marketing plans, and customer and supplier lists and related information); (vi) software; (vii) and (viii) all other intellectual property and proprietary rights.

(ix)  "Knowledge" as used with respect to a Person (including references to such Person being aware of a particular matter) means, with respect to the Seller Group, the knowledge after due inquiry of Michael Healy, Alvin Joiner, and the respective managers, officers, directors or similarly situated Persons in Equityholder, Hirmarker and/or AIDIW, including in each case the knowledge of any such Persons obtained or which would have been obtained from a reasonable investigation.

(x)  "Order" means any decree, injunction, judgment, order, ruling, writ, quasi-judicial decision or award or administrative decision or award of any federal, state, local, foreign or other court, arbitrator, mediator, tribunal, administrative agency or Regulatory Authority to which any Person is a party or that is or may be binding on any Person or its securities, assets or business.

(xi)  "Permitted Encumbrances" means Liens for Taxes not yet due and payable (other than Taxes arising out of the transactions contemplated by this Agreement).

(xii)  "Person" means an individual, corporation, partnership, joint-venture, limited liability company, Regulatory Authority, trust, unincorporated association or other entity.

(xiii)  "Purchase Document" means this Agreement and the other documents or agreements to be executed in connection herewith, including, without limitation, the Trademark Assignment and Domain Name Assignment.

(xiv)  "Regulatory Authority" means any federal, state, county, local, foreign or other governmental, public or regulatory agencies, courts, administrative agency, authorities (including self-regulatory authorities), instrumentalities, commissions, boards or bodies having jurisdiction over the parties and their respective subsidiaries

(xv)  "Tax" or "Taxes" means any federal, state, county, local, city or foreign tax, charge, fee, levy, impost, duty, or other assessment, including income, gross receipts, excise, employment, sales, use, transfer, recording, license, payroll, franchise, severance, documentary, stamp,

*[Exhibit A to Asset Purchase Agreement]*

occupation, windfall profits, environmental, federal highway use, commercial rent, customs duty, capital stock, paid-up capital, profits, withholding, Social Security, single business and unemployment, disability, real property, personal property, registration, ad valorem, value added, alternative or add-on minimum, estimated, or other tax or governmental fee of any kind whatsoever, imposed or required to be withheld by any Regulatory Authority, including any interest, penalties, and additions imposed thereon or with respect thereto.

(xvi)   "Transaction Expenses" means all expenses or obligations of the Seller Group incurred in connection with the preparation, execution, performance and/or consummation of this Agreement, the other Purchase Documents, or the Closing, including (a) all brokerage commissions, fees, expenses and disbursements, (b) all fees, expenses or other payments made in order to obtain any consents or approvals or to give notices in connection with the transactions contemplated hereby, (c) all payments to employees, consultants, independent contractors, directors, managers, officers, or Affiliates of the Business which come due as a result of the transactions contemplated hereby, including any change of control, stay or transaction bonuses, and (d) all fees and disbursements of attorneys, accountants, and other advisors and service providers payable by the Seller Group.

**Schedule 1.02(a)**

**Seller Intellectual Property**

| U.S. Registration No. | Registration Date | Mark | Goods/Services |
|---|---|---|---|
| 5,476,356 | May 22, 2018 |  BRASS KNUCKLES | Class 025: clothing; T-shirts; hoodies; headwear |
| 5,476,357 | May 22, 2018 |  BRASS KNUCKLES | Class 025: clothing; T-shirts; hoodies; headwear |
| 5,541,624 | August 14, 2018 | BRASS KNUCKLES | Class 009: batteries Class 010: vaporizers for medical purposes; atomizers sold empty for medical use; vapor cartridges sold empty for medical use Class 021: glass jars |

*[Schedule 1.02(a) to Asset Purchase Agreement]*

**<u>Schedule 1.03(d)</u>**

**Excluded Assets**

[None.]

*[Schedule 1.03(d) to Asset Purchase Agreement]*

**<u>Schedule 1.07</u>**

**Allocation Schedule**

[TBD]

*[Schedule 1.07 to Asset Purchase Agreement]*

**[Schedule 2.02(d)**

**Lien Releases**

[None.]]

*[Schedule 2.02(d) to Asset Purchase Agreement]*

**<u>Schedule 3.02</u>**

**No Violation**

[None]

**Schedule 3.05(b)**

**Intellectual Property Agreements**

<u>Inbound Licenses</u>:

<u>Outbound Licenses</u>:

*[Schedule 3.05(b) to Asset Purchase Agreement]*

**Schedule 3.06**

**Seller Group Brokers/Finders**

[None.]

*[Schedule 3.06 to Asset Purchase Agreement]*

# EXHIBIT P

DocuSign Envelope ID: 70B7758E-8904-4A94-838B-34FE1B858820

July [_____], 2023
   13

Hitmarker LLC


Attention: Alvin Joiner

    Re:    **Indemnification Rights**

Dear Mr. Joiner:

        This side letter agreement (this "<u>Agreement</u>"), is made as of the date set forth above, by and among (i) AIDIW LLC, a Delaware limited liability company ("<u>AIDIW</u>"), (ii) Michael Healy ("<u>Healy</u>" and together with AIDIW, the "<u>Indemnitors</u>" and each an "<u>Indemnitor</u>"), (iii) Hitmarker LLC, a Delaware limited liability company ("<u>Hitmarker</u>"), and (iv) Alvin Joiner ("<u>Joiner</u>" together with Hitmarker, the "<u>Indemnitees</u>" and each an "<u>Indemnitee</u>").

        In connection with the execution and delivery of, and effective as of the effective date of, that certain Asset Purchase Agreement by and among, (i) [SOLID STRIKE LLC], a Delaware limited liability company ("<u>Buyer</u>"), (ii) BKIP LLC, a California limited liability company ("<u>Seller</u>"), (iii) Winslow & Shoomaker, LLC, a California limited liability company ("<u>Equityholder</u>"), (iv) Indemnitors, and (v) Indemnitees (the "<u>Purchase Agreement</u>") pursuant to which Buyer shall purchase certain intellectual property and trademark assets of Seller (the "<u>Acquired Assets</u>"), Indemnitors and Indemnitees agree as follows:

RECITALS

        **WHEREAS**, AIDIW and Hitmarker are the two members of Equityholder, and Equityholder is the sole member of Seller;

        **WHEREAS**, AIDIW and Hitmarker sent a Notice of Member Removal to Red Sushi LLC, a California limited liability company ("<u>Red Sushi</u>") and David Augilar ("<u>Augilar</u>") on September 26, 2022 (the "<u>Member Removal Letter</u>") regarding Red Sushi's removal as a Member of Equityholder pursuant to Article 4.2 of the Operating Agreement of Equityholder based on Red Sushi's "habitual disregard of day-to-day management activites", among other violations by Red Sushi of the Equityholder's Operating Agreement; and

        **WHEREAS**, as an inducement to Indemnitees to enter into the Purchase Agreement, the Indemnitors agree to indemnify the Indemnitees, relating to the Purchase Agreement and certain Seller liabilities, on the terms and conditions herein provided.

        **NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

AGREEMENT

    1.    Indemnitors shall remit payment of up to $500,000.00, towards resolving the liabilities of

Seller and Equityholder as set forth in Schedule 1. Indemnitees shall have no further financial obligations for the liabilities of Seller or Equityholder. Indemnitors shall resolve the liabilities within thirty (30) days of execution of this Agreement, unless, the Seller or Equityholder is contemplating filing for bankrupty protection, then in such event, the deadline to resolve the liabilities shall be extended until the debts have been discharged in the bankrupty.

2.      The Indemnitors agree to indemnify and hold Indemnitees harmless against any and all losses, claims, damages or liabilities, joint or several, to which Indemnitees may become subject to pursuant to (i) any and all losses, claims, damages or liabilities (or actions in respect thereof) arising out of or based upon claims asserted by Red Sushi and/or Augilar against Indemnitees, Seller, or Equityholder with respect to (a) the Member Removal Letter, (b) Red Sushi and/or Augilar's rights as a Member of Equityholder, or (c) Red Sushi and/or Augilar's interest in the proceeds of the Purchase Agreement, (ii) any liabilites of Seller not set forth on Schedule 1 hereto, (iii) to the extent claims are made against the Seller, Equitholder or the Indemnitees, any total gross liabilities of Seller or Equityholder in excess of $500,000, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon liabilities strictly relating to the liabilities of Seller or Equityholder and not any liability solely attributable to Indemnittees (excluding any breach of the Indemnitor's joint and several representations, warranties and agreements contained in Article III of the Purchase Agreement) and (iv) to the extent Buyer asserts a claim pursuant to Section 6.01 of the Purchase Agreement.

3.      Promptly after your receipt of notice of the commencement of any action, you agree that, if a claim in respect thereof is to be made against Indemnitors under this Agreement, you will notify Healy in writing of the commencement thereof within twenty (20) days of Indemnitees notice of the commencement of action or claim; but the failure so to notify Healy (a) will not relieve Indemnitors from liability under paragraph 1 above (x) unless and to the extent the Indemnitors did not otherwise learn of such action and such failure results in the forfeiture by Indemnitors of substantial rights and defenses, or (y) Indemnitees do not notify Healy within one hundred and twenty (120) days of receipt of notice of the commencement of any action, and (b) will not, in any event, relieve the Indemnitors from any future obligations to Indemnitees other than the indemnification obligation provided under paragraph 1 above pursuant to that cause of action or a cause of action built upon the same or similar underlying facts. The Indemnitors shall be entitled to appoint counsel of the Indemnitors' choice at the Indemnitors'expense to represent Indemniteees' in any action for which indemnification is sought (in which case the Indemnitors shall not thereafter be responsible for the fees and expenses of any separate counsel retained by Indemnitees except as set forth below); *provided*, *however*, that such counsel shall be reasonably satisfactory to Indemnitees with their prior approval not to be unreasonably withheld. Notwithstanding the Indemnitors' election to appoint counsel to represent Indemnitees in an action, Indemnitees shall have the right to employ separate counsel (including local counsel), and the Indemnitors' shall bear the reasonable fees, costs and expenses of such separate counsel if (a) the use of counsel chosen by the Indemnitors to represent Indemnitees would present such counsel with an identifiable and actual conflict of interest, (b) the actual or potential defendants in, or targets of, any such action include both Indemnitees and the Indemnitors and Indemnitees shall have written opinion of counsel that reasonably concludes that there are legal defenses available to Indemnitees which are different from or additional to those available to the Indemnitors, (iii) the Indemnitors shall not have employed reasonably satisfactory counsel to Indemnitees within a reasonable time after notice of the institution of such action, or (iv) the Indemnitors shall authorize Indemnitees to employ separate counsel at the expense of the Indemnitors. The Indemnitors will not, without Joiner's prior written consent (which consent shall not be unreasonably withheld), settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not Indemnitees are an actual or potential party to such claim or action) unless such settlement, compromise or consent includes an unconditional release of Indemnitees from all liability arising out of such claim, action, suit or proceeding. The Indemnitors shall not be liable to Indemnitees under this Agreement regarding any

# SCHEDULE "1"

| Priority | Issue | Entity Owed | Total Amount Owed Window/BK | Total Amount Owed By Alvin | Total Amount Already Paid By Alvin | Total Remaining Amount Owed By Alvin | Total Amount Owed By Mike | Total Amount Already Paid By Mike | Total Remaining Amount Owed By Mike | Total Remaining Amount Owed Window/BK |
|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Class action settlement amount | Robbins Kaplan Legal | $245,000.00 | $122,500.00 | $0.00 | $122,500.00 | $122,500.00 | $83,333.00 | $39,167.00 | $161,667.00 |
| 5 | Class action legal fees and expenses still owed | Robbins Kaplan Legal | $3,968.50 | $1,984.25 | $0.00 | $1,984.25 | $1,984.25 | $0.00 | $1,984.25 | $3,968.50 |
| 11 | Sales and use tax | DRE Legal | $17,398.82 | $8,699.41 | $0.00 | $8,699.41 | $8,699.41 | $17,398.82 | -$8,699.41 | $0.00 |
| 10 | Sales and use tax court representation | DRE Legal | $41,709.91 | $20,854.96 | $0.00 | $20,854.96 | $20,854.96 | $41,709.91 | -$20,854.96 | $0.00 |
| 2 | Excise hearing travel expense | DRE Legal | $1,200.00 | $600.00 | $0.00 | $600.00 | $600.00 | $0.00 | $600.00 | $1,200.00 |
| 12 | Excise tax assessment - TBD | DRE Legal | $7,200,000.00 | | | | | | | $0.00 |
|  | Trademark legal fees owed - TBD | Knobbe Martin | $80,000.00 | | | | | | | $0.00 |
| 1 | Excise tax legal | DRE Legal | $35,000.00 | $17,500.00 | $0.00 | $17,500.00 | $17,500.00 | $35,000.00 | -$17,500.00 | $0.00 |
| 3 | Excise tax legal | DRE Legal | $17,700.00 | $8,850.00 | $0.00 | $8,850.00 | $8,850.00 | $17,700.00 | -$8,850.00 | $0.00 |
| 8 | Falcon investigation and complaint shell | DRE Legal | $360,000.00 | $180,000.00 | $0.00 | $180,000.00 | $180,000.00 | $180,000.00 | $0.00 | $180,000.00 |
| 9 | David Separzadah legal fees owed | DRE Legal | $462,000.00 | $231,000.00 | $55,000.00 | $176,000.00 | $231,000.00 | $231,000.00 | $0.00 | $136,000.00 |
| 13 | Sales and use legal fees owed | DRE Legal | $100,000.00 | $50,000.00 | $0.00 | $50,000.00 | $50,000.00 | $0.00 | $50,000.00 | $100,000.00 |
| 6 | New San Diego suit possible settlement | DRE Legal | $55,000.00 | $27,500.00 | $0.00 | $27,500.00 | $27,500.00 | $0.00 | $27,500.00 | $55,000.00 |
| 7 | CA Secretary of State LLC annual filing fees (Past 3 Years) - TBD | CA State | | | | | | | | $0.00 |
| 14 | Class action legal fees | Robbins Kaplan Legal | $1,590.00 | $795.00 | $0.00 | $795.00 | $795.00 | $0.00 | $795.00 | $1,590.00 |
| Total | | | $8,618,977.23 | $669,488.62 | $55,000.00 | $614,488.62 | $669,488.62 | $606,141.73 | $63,346.89 | $837,835.50 |

DocuSign Envelope ID: 70B7756E-3904-4A94-838B-34FE1B858820

settlement or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not Indemnitees are an actual or potential party to such claim or action) unless such settlement, compromise or consent is consented to by Healy (which consent shall not be unreasonably withheld) in which case the Indemnitors agree to indemnify and hold Indemnitees harmless from and against any loss or liability by reason of such settlement, compromise or consent.

4.      In the event that the liaiblites set forth in Schedule 1 of the Seller or Equityholder paid by the Indemnitor as required in section 1  resolve for less than $500,000 (the amount less than $500,000, the "Savings"), Indemnitors agree to take such commercially reasonable actions as necessary to distribute 50% of the Savings to Hitmarker through distributions of Seller and Equityholder based on pro rata ownership of the Equityholder. Within ten (10) business days of a request, Hitmarker shall be enttiled to receive a statement detailing the payment of such liabilities. For the avoidance of doubt, if the liabilities of Seller resolve for $400,000, the Savings shall equal $100,000 and Hitmarker shall be entitled to receive, through distributions of Seller and Equitholder, $50,000. Any payments due Hitmarker hereunder shall be remitted within ten (10) business days of Indemnitor resolving the Seller or Equityholder liabilities.

5.      This Agreement will be governed by and construed in accordance with the laws of the State of Delaware. Should any provisions of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby. This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter. This Agreement may only be changed by mutual written agreement of the parties hereto. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.

The rights described herein shall terminate and be of no further force or effect upon (a) mutual agreement of the parties hereto to terminate this Agreement, and (b) 24 months following the date of this Agreement or with respect to the Savings, 24-months after the last event related to the Savings.

[Signature Page Follows]

BN 77235698v3

Very truly yours,                                    Agreed and Accepted:

**Hitmarker LLC, a Delaware limited liability company**

By _Alvin Joiner_
[NAME] Alvin Joiner
[TITLE] Manager

_Alvin Joiner_
Alvin Joiner

**AIDIW LLC, a Delaware limited liability company**

By _Mike Healy_
[NAME] Mike Healy
[TITLE] Manager

_Mike Healy_
Michael Healy

SIGNATURE PAGE TO SIDE LETTER AGREEMENT